UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JULIA GRIFFITH,                                  )
1702 Chesterford Way                             )
McLean, VA  22101,                               )
                                                 )
                    Plaintiff,                   )
                                                 )
        v.                                       )  Civil Action No.
                                                 )
CHRISTOPHER COX,                                 )
as and in his capacity as                        )
CHAIRMAN OF THE                                  )
SECURITIES & EXCHANGE COMMISSION,                )
450 Fifth Street, N.W.                           )
Washington, D.C. 20549,                          )
                                                 )
                    Defendant.                   )
_____) JURY TRIAL DEMANDED

**VERIFIED COMPLAINT**
(Age and Gender Discrimination)

A.  JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action under Title VII of the Civil Rights Act

of 1964, as amended (Title VII), 42 U.S.C. §§2000e-5(f) and 16(c); the Age Discrimination in

Employment Act of 1967, as amended (ADEA), 29 U.S.C. §§626(c) and 633a(c); and 28 U.S.C.

§1331.

2.      Venue properly lies within this Court because the cause of action arose in the

District of Columbia.  See 42 U.S.C. §2000e-5(f)(3); 29 U.S.C. §633a(c); 28 U.S.C. §1391(e).

B.  THE PARTIES

3.      Plaintiff Julie Griffith (hereinafter "Plaintiff") is an employee of the Securities

and Exchange Commission (SEC) and a resident of Virginia.

4.      Christopher Cox is, and is sued in his official capacity of, Chairman of the Securities and Exchange Commission (hereinafter "the Agency").

## C.  THE FACTS CENTRAL TO PLAINTIFF'S CLAIMS

5.      Plaintiff is a woman.

6.      She was born on July 25, 1957, and was 42 years old or older when most of the important events of this case occurred.

7.      Before joining the Agency, plaintiff had more than six years of experience in securities law.

8.      Following her graduation from NYU Law School in 1988, plaintiff accepted a clerkship with the Chancellor of the Court of Chancery of the State of Delaware, widely regarded as the nation's most important court for corporate transactions, including mergers and acquisitions.  She then spent four years as a Wall Street securities attorney with the firm of Cravath, Swaine & Moore, and approximately two years practicing securities law with a regional firm in Washington.

9.      On September 25, 1996, the SEC hired plaintiff as an Attorney-Advisor, GS-905-13/5 in the Health Care and Insurance Group in the Division of Corporation Finance.

10.      Ms. Griffith was immediately assigned to filings that her supervisor regarded as "difficult and complex."

11.      Plaintiff performed very well as an Attorney-Advisor in the Health Care and Insurance Group.

12.      On her first performance evaluation, her supervisors rated her Satisfactory or above on all performance criteria.

13.    At that time the SEC had four performance categories –Unacceptable, Satisfactory, Good, and Exceptional.

14.    Also at that time the majority of attorneys at the SEC were receiving mostly Satisfactory ratings.  Ratings of Good or Exceptional were given essentially to indicate exemplary performance and generally resulted in step increases.

15.    In November 1997 plaintiff transferred from the Health Care and Insurance Group to the Transportation and Leisure Group.

16.    She performed very well in the Transportation and Leisure Group.

17.    In April 1998 her supervisors rated her satisfactory or above on all performance criteria.

18.    In 1998, after receiving a within-grade merit increase, plaintiff was selected for a merit promotion to the position of Special Counsel, Office of New Products and Structured Finance, under newly appointed Assistant Director Mark Green.

19.    In about April 1999 Mr. Green gave plaintiff a performance evaluation which rated her satisfactory on all performance criteria.

20.    The Office of Structured Finance did not function well, and in late 1999 or early 2000 it disbanded.

21.    In June 1999 plaintiff applied for a position as a Special Counsel in the Office of Mergers and Acquisitions ("OM&A").

22.    The Office of Mergers and Acquisitions is a "support office" within the Division of Corporation Finance.  This means that the Special Counsels in the Office advise Agency Staff Attorneys, Special Counsels, and Counsels to Commissioners on the laws pertaining to business

combination transactions.  They also address questions of policy and interpretation of the relevant laws from the securities bar and the general public.

23.     Among other things, the Office of Mergers and Acquisitions reviews the work of other attorneys in the Division of Corporation Finance.

24.     Positions in that office are highly competitive and difficult to obtain

25.     Mauri Osheroff, an Associate Director in the Division of Corporation Finance, interviewed plaintiff with Dennis Garris, then Chief of the Office of Mergers and Acquisitions (then in his thirties), and approved plaintiff's transfer to OM&A.

26.     Ms. Osheroff has no children, has never been married, and lives alone.

27.     Plaintiff began work in OM&A in July 1999, the same month that she celebrated her 42nd birthday.

28.     The other lawyers in the office at the time plaintiff started were James J. Moloney (then approximately age 34), Nick Panos (then approximately age 33), who joined the office in January 1999, after six months as a rotator in the office; Tina Chalk (then approximately age 35); Laura Badian (then in her mid-forties); and Pam Carmody (then approximately age 33), who joined at the same time plaintiff did.

29.     Plaintiff was the only attorney in the office other than Laura Badian who was then over 40.

30.     OM&A has not hired any attorneys over 40 during the nearly eight years plaintiff has been there, although at least eight lawyers have been hired during that period.

31.     As an attorney in OM&A, plaintiff analyzes and comments on mandatory disclosure filed with the Securities and Exchange Commission for business combination transactions, to ensure compliance with the Williams Act of 1968 and other applicable provisions

of the Securities Act of 1933 and the Securities Exchange Act of 1934, and the rules promulgated under these laws.  Plaintiff also provides guidance to members of the securities bar and members of the Agency's staff on issues arising under laws and rules within the jurisdiction of OM&A, and prepares written interpretive positions when asked to do so.  She also reviews the work of attorney advisors and Special Counsels or reviewing attorneys within the Division of Corporation Finance.

32.     The Agency categorizes plaintiff's work in OM&A as highly complex.

33.     Sometimes attorneys in OM&A simply have reasonable differences of legal interpretation on their filings, with neither being "right" or "wrong."  Also, members of the OM&A staff sometimes have differences of legal interpretation with other members of the staffs of the Divisions of Corporation Finance and Enforcement.

34.     Under SEC Rules, tender offers to take over public corporations must be kept open for 20 business days.

35.     As a matter of its own internal custom, not because of any law, regulation, or rule, OM&A endeavors to review tender offers within 10 business days.  OM&A has no written manual which states this informal policy.

36.     By or about September 28, 1999, plaintiff completed a three-month probationary period in OM&A, and Mr. Garris (with the direct approval of his supervisor, Ms. Osheroff) approved her permanent tenure there.

37.     At that time the Chief of OM&A either reviewed the work of new Special Counsels himself, or directed more senior Special Counsels to do so, for a period of less than one year.

38.     In or about April 2000, Ms. Badian, a single mother in her forties, quit the SEC, citing the need to spend more time with her then-elementary school-aged daughter.  Ms. Badian was intensely involved with the adoption of two important rulemaking initiatives, Regulation M-A (17 CFR §§229.1000-1016) and Rules 800, 801 and 802, pertaining to cross border rights offerings, exchange offers or business combinations (17 CFR §§230.800-230.802), which demanded significant amounts of overtime in the office.

39.     In May 2000, Mr. Garris gave plaintiff a performance evaluation for the May 1999-April 2000 ratings period.  Her ratings for the period were satisfactory, good, and exceptional and he stressed, "Ms. Griffith is very helpful to the public and the staff.  She is always willing to help answer questions.  She always has a pleasant demeanor and is thoughtful of others."

40.     Plaintiff received pay increases in January and March 2001.

41.     On or about July 2, 2001, Mr. Garris gave plaintiff a performance evaluation, on which he rated her Satisfactory or above in all categories and Pass overall.

42.     In the fall of 2001, her son moved to a school in the Fairfax County public school system with a gifted and talented center.  It started at 9:00 and finished at 3:40.

43.     After Labor Day, September 2001, plaintiff started working an altered work schedule, from 7:00 a.m. until 3:30 p.m., to accommodate her son's new school schedule and to limit the time her second child spent in after-school care each day.

44.     By virtue of being a mother and having school-age children, which was a by-product of her own age, plaintiff had family responsibilities which her colleagues in OM&A did not have.  Before her children started school, plaintiff and her husband had been able to limit the time their children stayed in daycare while working later in the day by sharing the transportation

responsibilities.  When their children started school, a parent needed to be home with them in the late afternoon.

45.    In about the fall of 2001 Mr. Garris decided that all of plaintiff's work should be reviewed before it was sent out to counsel for the parties to the transactions under review.

46.    Later Mr. Garris himself reviewed a small number of her filings, but did not make substantive changes in any of them.

47.    Mr. Garris then assigned plaintiff's peers --Mr. Panos, Ms. Carmody, and Ms. Chalk-- to review her work and make comments on her letters before they were sent out.

48.    This peer review was not sanctioned by any SEC or Division rules, and it was unprecedented.

49.    No other attorney in OM&A who had passed the initial "probationary" or "trial" period had ever been subjected to such a peer review.  Nor has any since then.

50.    At this point, Mr. Garris did not believe that all of plaintiff's work should be reviewed.

51.    Initially, Mr. Garris told plaintiff that the review of her work would continue only until he was satisfied about its quality.

52.    However, he maintained the procedure intermittently for the remainder of his tenure at the SEC (i.e., until about March 2003).

53.    Very shortly thereafter, Mr. Garris stated that he was dissatisfied with her work, in spite of favorable written evaluations, and forced Ms. Griffith, the most experienced attorney in the office other than Mr. Garris, to have her work reviewed by other attorneys before it was sent out to counsel.

54.    On information and belief, Ms. Chalk's first child was born in July 1999, and her second child was born in the spring of 2003; Mr. Garris adopted two young children from Russia in early 2003; and Ms. Carmody's first child was born in April 2000, and her second child was born in 2003. After Ms. Badian left in 2000, all of the other attorneys in the office were young, single, or newly married people in their thirties without children.

55.    The demands on OM&A Special Counsel were too great for them to perform their work in normal workweeks of 40 hours; to keep up, they regularly had to work late. This practice has continued intermittently to the present day. Attorneys are not compensated for this overtime.

56.    However, by virtue of her unique status, being the only woman in the office with school-aged children, plaintiff could not stay late and still meet the needs of her family.

57.    Mr. Garris's approach to plaintiff reflected both gender stereotypes and an age bias. Thus, his actions indicated that he was dissatisfied with the amount and quality of plaintiff's work, and he made unfavorable references to people who "fly out the door" at the end of their workdays; he told plaintiff that other people, including single people suffering from cancer, had heavy demands on them, too, and managed to make it work. He compared plaintiff with employees with younger children whose childcare arrangements differed from plaintiff's, and said that Ms. Griffith "should be able to work it out." Mr. Garris refused to discuss schedule changes or workload changes that would have allowed plaintiff to perform her job more easily, and he refused to consider that, with respect to compulsory overtime, an employee in her forties with school-aged children was differently situated from a younger employee with no children. Mr. Garris' pejorative view of Ms. Griffith as someone who left promptly at the end of her

scheduled workday in order to meet family demands had a negative effect on his perception of her and his perception of her work.

58.     By assigning more filings to Ms. Griffith than she could appropriately consider in the available time, Mr. Garris left Ms. Griffith less time than her peers had to complete her work. The addition of extra days, which had to be subtracted from the 10 business days allotted for the review of a filing, to permit other attorneys to go over Ms. Griffith's work a second time, further tightened her deadlines.

59.     The peer review system not only added an unnecessary layer of review on plaintiff's work; it also gave her peers the incentive to find fault with her work.

60.     In about April 2002 Mr. Garris rated plaintiff satisfactory or good in all categories, but his written comments mentioned the fact that most of her work was reviewed.

61.     In about May 2002 plaintiff nonetheless received a salary increase.

62.     On or about August 16, 2002, Mr. Garris gave plaintiff a salary review.  Again he gave her rating of Satisfactory or Good in all categories and an overall rating of pass.  However, his written comments were very critical of her.

63.     In about the fall of 2002 plaintiff's peers continued to review her work, through it was sporadic.

64.     In about December 2002 the SEC awarded plaintiff and others in her Division the Capital Markets Award for participation in a task force which measured compliance with recommended regulations in accordance with the Sarbanes-Oxley Act of 2002.

65.     The award is presented annually to selected attorneys and accountants "In recognition of [your] tireless efforts to strengthen the capital markets in the United States and, thereby, the contributions these markets make to the economic future of the nation."

66.    On or about January 12, 2003, the Agency gave plaintiff another salary increase .

67.    In about March 2003 Mr. Garris gave plaintiff another salary review.

68.    He again rated her satisfactory or good in all categories and again criticized her with his narrative comments.

69.    On or about March 19, 2003, plaintiff submitted a memo in response to Mr. Garris's review.

70.    In this memo plaintiff pointed out to Mr. Garris that everyone else in the office was able to put in extra time, but she was not able to do so, because of her family responsibility.

71.    In about the end of March 2003, while Mr. Garris was out of the office for an extended period, Ms. Carmody served as interim office chief.

72.    During that period Ms. Osheroff never reviewed any of plaintiff's filings, even when Ms. Griffith specifically asked her to look at some of them.  Also, during the time Mr. Garris was on leave, some of plaintiff's filings were reviewed by Ms. Carmody or Mr. Panos, but most were not.

73.    During the spring proxy season of 2003, after Mr. Garris left the Commission, plaintiff and her colleagues handled an unusually large number of proxies and other filings.

74.    The required number of filings for an attorney in an industry group is six per month, and usually some of that allotment is routine filings that are not "highly complex."

75.    All of plaintiff's filings in OM&A were highly complex, and she completed 90 in ten months, in addition to performing other duties.

76.    During this time, some of plaintiff's work was reviewed by her peers, but much of it was not.

77.     Shortly before he left the SEC, Mr. Garris recommended to Ms. Osheroff that all of plaintiff's work should be reviewed for the foreseeable future.

78.     Mr. Garris did not identify for plaintiff any specific mistakes or failures on her part to justify the continued review.

79.     Plaintiff protested that he had no basis for requiring her work to be reviewed.

80.     After Mr. Garris left, Ms. Osheroff temporarily served as de facto interim supervisor over OM&A, and she did not review plaintiff's work.

81.     In June 2003, the Agency hired Brian Breheny as the Chief of OM&A.

82.     Mr. Breheny is single, has never been married, and has no children.

83.     At the time SEC hired him, Mr. Breheny was 36 years old and had a limited securities law background, compared with attorneys in the office, including Ms. Griffith.

84.     Ms. Osheroff selected Mr. Breheny over Ms. Laurie Green, a woman who had considerable experience in OM&A.

85.     At the time Ms. Green was over 40 and had two children in elementary school. (She later left the SEC to become a securities law partner with a Florida firm to be closer to family who could help care for her children.)

86.     All of plaintiff's other colleagues then (Nick Panos, Tina Chalk, Pam Carmody, Lily Brown, Mara Ransom, Abby Adams, and Michelle Anderson) were under 40.

87.     Also, some of them (namely Mr. Panos, Ms. Brown, Ms. Ransom, and Ms. Adams and Ms. Anderson) had no children, and none of them had children who were old enough to be in elementary school.  No other attorney had children who would need parental supervision during the late afternoon after school hours.

88.    The attorneys who are not married and/or who have no children have fewer personal demands on them and can choose to stay at the office longer if they have filings that require more time.

89.    When Mr. Breheny joined OM&A, in July 2003, plaintiff's peers were reviewing some, but not all, of her work.

90.    When Mr. Breheny joined the office, he had never reviewed a filing.  Since joining the office he has reviewed very few filings.

91.    After Mr. Breheny came to OM&A, Ms. Osheroff told him that other Special Counsels in the office were reviewing Ms. Griffith's work, under a policy that Mr. Garris had implemented, and that Mr. Breheny should make his own determination about whether he thought this "peer review" should continue.

92.    On or about August 12, 2003, Ms. Osheroff gave Plaintiff an interim performance evaluation.

93.    At the time plaintiff asked when she would stop being reviewed by her peers.  Ms. Osheroff said plaintiff would continue being reviewed until Mr. Breheny had had time to evaluate her.

94.    Plaintiff responded that she had had few role models in her career, but that she had considered Ms. Osheroff to be one, that she respected her legal judgment and looked up to her, but was bitterly disappointed at the way she had handled the review procedure.  At one point plaintiff said, "Frankly, Mauri, I think that the way you and Dennis have treated me is actionable."

95.    Ms. Osheroff visibly shaken disturbed by that statement.  She said, "Oh, now you're saying you're going to sue."

96.     Plaintiff said that she had not said she was going to sue, but she believed that she had a cause of action for slander against Ms. Osheroff and Mr. Garris based on the way they had treated her in front of her colleagues and others in the Division.

97.     Ms. Osheroff told Mr. Breheny about Ms. Griffith's threat to bring a case against her and specifically referred to her use of the word "actionable."

98.     A day or two later, in about mid-August 2003, Mr. Breheny called plaintiff into his office and said that he wanted to resolve the review situation.  He said that he did not believe in putting people on open-ended reviews without specific criteria, and he thought they could resolve it in six weeks.  He said he would review some of her filings and they could talk at the end of that period.

99.     Initially his comments were quite positive, but many of Mr. Breheny's questions about the filings were irrelevant or showed that he did not fully understand the law or the transactions.

100.    Upon information and belief, Mr. Breheny did not review the filings of anyone else in OM&A.

101.    At all relevant times, Mr. Breheny has continued to subject plaintiff's work to the same peer review process.

102.    In about the fall of 2003, Mr. Garris invited Mr. Breheny to co-teach the Mergers and Acquisitions course with him at Georgetown University Law Center's night program.

103.    At the time Mr. Garris had known Mr. Breheny only a month or two.

104.    After they met, they may have socialized more than ten times.

105.    Also during September 2003 Mr. Breheny decided that plaintiff's filings should be reviewed for an additional three-month period, until November 2003.

106.    However, he did not give explain to plaintiff why her peers should continue to review her work.

107.    No one else in OM&A with the same amount of experience in mergers and acquisitions law or with the same length of service in OM&A was still being reviewed after their initial hiring period.

108.    On information and belief, one attorney in OM&A, a male, was the only person, other than plaintiff, whose work was reviewed more than 13 months after his first year in the office.

109.    Throughout the entire time he has supervised plaintiff, Mr. Breheny has continued to require her to submit her work to her peers to review.

110.    Plaintiff's peers' reviews of her work have not resulted in significant changes in the filings she has reviewed, and they have not improved investor protection.

111.    By asking plaintiff's peers to review her work, Mr. Breheny has created a situation that promotes peer criticism of plaintiff's work.  Since the Agency has allocated a limited amount of money for step increases, and the portion of that money which it allots to OM&A is also fixed, if one attorney is rated "Unacceptable," the pool of money available to the remaining attorneys is greater.  If Mr. Panos and Ms. Chalk find fault with Ms. Griffith's work, they not only please their supervisor, they also increase their own chances of getting a merit step increase.  It is for this reason, among others, that it would be more appropriate for a supervisor, rather than peers, to review an employee's work, but Mr. Breheny has chosen to go against Agency custom and treat Ms. Griffith differently.

112.    Also because of the peer review, plaintiff has had a more difficult time meeting stringent deadlines, since it adds days to the time required to send a response to counsel.

113.    These additional demands have required plaintiff to work at home, in the evenings, and on weekends to meet their timetables.

114.    It also gives plaintiff's supervisors a pretext on which to complain that her work is too slow.

115.    It is important for plaintiff to be in the office as many days as possible, so she can timely complete her filings and pass them on to her peers for review and send the response to counsel after her peers have reviewed them.

116.    On or about September 23, 2003, plaintiff requested a part-time schedule, from 7:30a.m. to 3:30 p.m. four days a week.

117.    The SEC's collective-bargaining agreement with the National Treasury Employees Union (NTEU) mandates that the SEC allow employees to work part-time, provided that they work at least 24 hours each workweek and they are present at the SEC during the "core hours" of 10 a.m. to 2 p.m.

118.    However, Mr. Breheny denied plaintiff's request to leave work at 3:30 p.m., even though it was sanctioned under the NTEU collective-bargaining agreement.

119.    Mr. Breheny stated that she needed to be in the office until at least 4:00. As a result, Ms. Griffith works until 4:00 p.m. each day that she is in the office, and her daughter has remained in after-school care. This has created significant problems for plaintiff's daughter, who is in a demanding gifted and talented school program and needs time to complete homework in the afternoon.

120.    Plaintiff had little choice but to accept the compromise, although it caused problems for her family, which worsened over time.

121.    On or about October 31, 2003, plaintiff received a new salary review from Mr. Breheny.

122.    This review was conducted under the new pay-for-performance system that the Agency adopted in 2003, and the categories were different from those in the old system.  The new system required that the employee be rated "Acceptable" or "Unacceptable" in each of four broad categories, and "Acceptable" or "Unacceptable" overall.  Unless the employee is rated "Acceptable" in each of the sub categories, she must be rated "Unacceptable" overall.

123.    Plaintiff's rating was Acceptable, and she received Acceptable ratings in all categories.

124.    Because of this process, plaintiff received a merit step increase.

125.    In or about December 2003 plaintiff again requested a schedule change, this time to allow her to work a part time schedule of three full days and two half days.

126.    Mr. Breheny categorically denied her request.  Mr. Breheny said that because of deficiencies in plaintiff's work, he did not believe her proposed schedule met the "staffing, workload and mission requirements of the office."  He insisted that she work 24 hours, rather than her proposed 32, and that she be in the office Mondays, Wednesdays, and Fridays from 7:30 a.m. until 4:00 p.m.  He asserted that she had committed to teach a class at Georgetown University during Commission core hours "without permission," although in June 2003, Ms. Osheroff had congratulated her warmly on being selected for the teaching position and had said it was something Ms. Griffith should do.

127.    In January 2004 plaintiff adopted the part-time schedule which Mr. Breheny arranged for her.

128.    Also in January 2004, she began teaching "Corporate Transactions: Negotiating the Deal and Drafting the Documents," at Georgetown University Law Center during hours she was not scheduled to work at the commission.

129.    Because of the schedule change which Mr. Breheny imposed on her, plaintiff was not scheduled to be in the office every day, and her work was sometimes delayed.  Thus, if a filing arrived in OM&A on a Monday (the first business day) and was assigned to her on a Tuesday, her day off (the second business day), and she received it on Wednesday (the third business day ), the plaintiff had only two days when she was in the office (Wednesday and Friday) to complete the filing and transmit it to the reviewer's hands by close of business on Friday (the fifth business day), so it could be returned to her in time to incorporate any comments by the reviewer and get it out the door by the tenth business day, the following Wednesday.  In order to meet this timetable to complete filings, plaintiff often worked on her days off, or late at night.

130.    The additional layers of review – from plaintiff to her peers and back to her – delayed her work even more and subjected her to criticism about her timeliness.

131.    Mr. Breheny's approach to plaintiff has boiled down to this:  he gives her work far greater scrutiny than he does any other lawyer in the office at her level; he criticizes small errors and discrepancies far out of proportion to their impact on the end product; and he has shifted responsibility away from her and to younger lawyers without reason or explanation.

132.    In June 2004 Mr. Breheny gave plaintiff an evaluation.  He expressed dissatisfaction with her work and verbally gave her a list of areas for improvement, including timeliness.  He also said that her work would continue to be reviewed by her peers.

133.    At that time plaintiff remained on part-time status because she needed to spend more time with her younger child, who was struggling with the increased homework demands and needed parental supervision after school.

134.    In August 2004, in anticipation of difficulties in balancing work and family with two children in demanding school programs in the fall, plaintiff requested that the Agency return her hours to 7:00 to 3:30.

135.    Mr. Breheny denied her request.

136.    Plaintiff replied, "I'm sorry, but this is very important to my family, and I am going to have to fight you on this."  Mr. Breheny responded, "Bring it on."

137.    On August 13, 2004, plaintiff filed a step one grievance over Mr. Breheny's denial of her schedule change.  She continued grieving the issue through November 2004.

138.    Meanwhile, in or about 2003, the SEC, despite its collective-bargaining relationship with the National Treasury Employees Union (NTEU), began unilaterally to implement a new performance management system, which eliminated specific categories and descriptions of employee performance in favor of a small number of more general categories.

139.    The general performance categories were based on such amorphous criteria as whether employees "focus on achieving results while adapting to changing priorities" or "present information accurately" or "gather and evaluate information to develop effective solutions" or "collaborate with others."

140.    The National Treasury Employees Union grieved the new performance management system, on the ground that in it the SEC used a set of vague and subjective "agency success factors" to determine whether and how much of a merit increase an employee would receive and that the generic factors were not linked to employees' job duties and could apply to

every position within the SEC, from administrative staff to IT staff and to attorneys, accountants and other professionals.

141.    Later NTEU sought arbitration of the grievance.

142.    In September 2007, an arbitrator (James M. Harkless) rendered a decision on the NTEU grievance.  The arbitrator found that the new SEC performance management system was "subjective" and "discretionary"; that the Agency's administration of this system had a disparate discriminatory impact on African-American employees in Grades 8-16 and on older employees at all salary grades with respect to merit pay raises; that the SEC used an invalid subjective system for awarding pay increases; and that the SEC's pay-for-performance program violated Title VII and the ADEA.

143.    Plaintiff has also become a victim of the SEC's discriminatory performance management system.

144.    The SEC has discriminated against plaintiff with respect to her performance ratings and pay, by either discriminatory intention or disparate impact.

145.    In March 2004, Mr. Breheny told plaintiff that her annual rating for 2003-2004 would be "Unacceptable."  He furnished a general list of alleged inadequacies with plaintiff's filings, but did not cite any instances of any other complaints about plaintiff's work, from either inside or outside the SEC.

146.    On or about May 13, 2005, Ms. Griffith requested a leave of absence to address her younger child's distress related to school.  Mr. Breheny granted her leave of six months.

147.    On or about May 13, 2005, although plaintiff's work was at least satisfactory, Mr. Breheny gave her a performance evaluation with an Unacceptable rating, rating her Acceptable on Execution of Duties, but Unacceptable on Planning and Organizing Work.

148.    At the same time he threatened to place her on a Performance Improvement Plan (PIP), beginning November 14, 2005, upon return from her planned leave of absence.

149.    The evaluation was unfair and discriminatory, for many reasons.

150.    First, she had considerable experience and expertise in mergers and acquisitions law, dating back to 1988 and including about five years of experience in OM&A.  Second, her work never declined from the "Acceptable" performance rating which Mr. Garris gave her and which Mr. Breheny initially gave her.  Third, Mr. Breheny's criticisms were pretextual.  Fourth, Mr. Breheny did not show how Plaintiff failed to meet the standards of her performance plan or provide specific examples to support his rating.

151.    Although it is true that not all of her filings were completed on time, a substantial majority of them were timely.  The element in her Performance Assessment Standards, Planning and Organizing Work stated the following standard for acceptable work:  "with few exceptions meets objectives" (emphasis added).

152.    Consistent with that standard, any untimely exceptions on her part were "few." Specifically, during the review period, plaintiff processed approximately 40 transactions.  Only a few were late, and of those, very few were late by more than one or two days.  No late filing jeopardized investors or even significantly inconvenienced counsel, and upon knowledge and belief, no one outside OM&A complained about plaintiff's timing.

153.    With respect to Mr. Breheny's allegations that plaintiff made mistakes in her work, all attorneys in the OM&A office, both male and female, over and under 40, make the kinds of mistakes that Mr. Breheny cited.

154.    At the time plaintiff's Performance Assessment Standard stated, "Oral and written communications further agency objectives and, with few exceptions, are clear, concise, well

organized, accurate, grammatically correct, and appropriate for the intended audience" (emphasis added).

155.    Even the Performance Assessment Standards allow for some errors because they state "with few exceptions," not "with no exceptions."

156.    Other attorneys in the office make mistakes, too.

157.    Mr. Breheny has essentially required plaintiff, to be removed from the review process, to prove that she never make mistakes.

158.    In holding plaintiff to a higher standard than other senior attorneys in the office, Mr. Breheny has discriminated against her.

159.    Mr. Breheny alleged that plaintiff "missed legal issues," but he cited no specific examples of how she allegedly "missed major legal issues," let alone committed any lapses to the detriment of investors, and he did not address the "Acceptable" standard of the performance evaluation.

160.    The Acceptable standard contemplates that the attorney must identify material legal issues "with few exceptions" (emphasis added).

161.    Plaintiff met the Acceptable standard.  She did not miss major issues; if she did miss issues, as every attorney does, it was only a "few" times; investors were not harmed, and in any event, Mr. Breheny did not call any to her attention.  On information and belief, no one from outside the Commission ever complained about her work.

162.    Plaintiff has continued to meet or exceed the "Acceptable" standard, as evidenced by the fact that Mr. Breheny has rated her Acceptable on her FY2006 and 2007 performance reviews.

163.    Isolated examples of allegedly missed issues do not prevent an attorney from

meeting the "Acceptable" standard of the performance evaluation.

164.    If Ms. Griffith actually had missed legal issues consistently, Mr. Breheny would not have been able to rate her acceptable in the categories, "Knowledge of Field or Occupation" and "Execution of Duties," on her performance evaluation.

165.    The Office of Mergers and Acquisitions routinely deals with issues involving billions of dollars worth of securities.  The parties are represented by very sophisticated counsel, the issues are novel and complex, and attorneys frequently have differences of opinion about the outcome.

166.    Other attorneys in the office misconstrue issues, but have received Mr. Breheny's praise.

167.    Mr. Breheny later complained to plaintiff that her leave slips made a far bigger pile than those of any other member of the office and that she asked for flexibility more often than she should.

168.    However, the Agency has never accused her of abusing leave policies, and she has never asked for leave that she is not entitled to take, and at all relevant time she has had significant amounts of accrued leave.

169.    Mr. Breheny could not reasonably deny plaintiff's leave requests because she had earned the leave she requested and he had no good cause to deny her leave requests, but he has created the impression that her requests are burdensome to him and interfere with her work.

170.    In turn, this creates tremendous stress for her, since she must take time from work to care for her children during school vacations, when they are sick, and after certain school hours.

171.    On or about November 28, 2005, on the Complainant's return from the leave and with Ms. Osheroff's approval, Mr. Breheny placed the Complainant on a PIP for a period of 120 days.

172.    The PIP did not refer to substantive issues with the quality of her work, but rather to the <u>timing</u> of her work and purported communications problems with Mr. Breheny.

173.    Mr. Breheny knew that if he gave her an unacceptable evaluation, it would trigger a PIP and put her in jeopardy of being removed.

174.    The discriminatory peer review practice, unacceptable rating, threat of a PIP, and PIP caused plaintiff considerable anxiety, and stress, and emotional distress.

175.    Since the office secretary and several lawyers in the office knew that plaintiff's work was reviewed, she lost the stature as a lawyer and a regulator that her position would otherwise command.

176.    Also, Mr. Breheny humiliated plaintiff in front of her colleagues, and continues to do so on a daily basis every time a filing sleeve circulates in the group with a label that identifies the filing as being assigned to "Griffith" and reviewed by someone else.

177.    The PIP threatened plaintiff's livelihood and the nearly twenty years she has invested in her legal career.

178.    Plaintiff is the only employee in OM&A whom Mr. Breheny has placed on a PIP.

179.    The unacceptable rating prevented plaintiff from receiving a step increase in that evaluation period and since then.  Since 2004 plaintiff has received no merit pay increases, although she received acceptable performance evaluations in fiscal years 2006 and 2007.

180.    During the 120-day PIP, plaintiff continued to perform her work very well.

181.    As an indication of her productivity and timeliness, during the 2006 fiscal year (October 1, 2005-September 30, 2006), plaintiff was assigned to 67 filings, all but one of which she submitted before the deadline of the tenth business day.

182.    By completing these filings and completing them on time, she far exceeded the work requirements for attorneys in the Division and met the requirements for *a full time attorney* in OM&A.

183.    An Agency Merit Pay Committee determines raises for Commission employees.

184.    Despite plaintiff's excellent performance, Mr. Breheny recommended that the Committee not give plaintiff a step increase, claiming (falsely) that her work was less complex than that of other OM&A attorneys.

185.    The Agency Merit Pay Committee accepted his reasoning without requesting supporting documentation from plaintiff which she had offered to provide it.

186.    In June 2006, Mr. Breheny removed plaintiff from the PIP.

187.    At the time, he stated that she had made "great improvement" and "taken it up a level." He said he still had misgivings about her legal work, and that they would continue to meet and discuss them, and that if her work faltered, he would put her back on a PIP.

188.    Although Mr. Breheny took plaintiff off the PIP, he declined to halt the peer review of her.

189.    By leaving her on an open-ended review without specifying what milestones she must reach in order to end the review, Mr. Breheny has continued to maintain a hostile environment for her.

190.    Plaintiff has repeatedly tried to transfer from OM&A to a less discriminatory office at the SEC, but Mr. Breheny has thwarted her efforts.

191.    By contrast, Mr. Breheny has promoted the careers of the younger lawyers in the office.

192.    Mr. Panos has less experience than plaintiff does and no experience outside the Commission, but Mr. Breheny has been giving Mr. Panos increasing levels of responsibility, increased exposure to the upper management of the Division, and, upon knowledge and belief, significant pay raises.

193.    At all times relevant to this case all of the other female Special Counsel were younger than plaintiff.

194.    Mr. Breheny assigned prestigious special projects, such as rulemaking, to Mara Ransom, who is under 40 and single, and beginning in 2006 he greatly increased the number of important projects he assigned to Mr. Panos, rather than to other attorneys in the office at his level.

195.    Ms. Chalk is significantly younger than plaintiff and has less experience than her, but Mr. Breheny has given her significantly more responsibility, speaking engagements, and special projects.  Ms. Chalk has children, but for much of the time relative to this complaint, her children were below elementary age.

196.    Ms. Carmody is significantly younger than plaintiff and has less experience than she does, but has been given significantly more responsibility, speaking engagements, and special projects.  Ms. Carmody has children, but for much of the time relative to this complaint, her children were below elementary age.

197.    Mr. Panos, Ms. Ransom, and Ms. Chalk have been promoted to Senior Special Counsel, partly as a result of the special projects which Mr. Breheny has assigned them.

198.    Ms. Carmody resigned from the SEC just before her oldest child reached the first grade.  Ms. Carmody is presently not employed outside her home.  (Plaintiff's son was eight years old and entering the third grade, when plaintiff altered her work schedule under Mr. Garris, and  plaintiff's  problems began.)

## D.  STATEMENT OF PLAINTIFF'S CLAIMS

### Count I:  Gender Discrimination
### (Title VII)

199.    Plaintiff adopts and incorporates by reference paragraphs 1-198 above.

200.    Title VII makes it unlawful for an employer, including the Agency, to discriminate in employment on the basis of race or gender.  42 U.S.C. §§2000e-2(a)(1), 2000e-16.

201.    In continuously requiring peer reviews of plaintiff's work unnecessarily, giving her an unacceptable rating on May 13, 2005, and putting her on a performance improvement plan (PIP) on November 28, 2005, the Agency intentionally discriminated against her because of her gender.

202.    In any event, the Agency's actions in requiring peer reviews of plaintiff's work, in giving plaintiff an unacceptable rating, and putting her on a performance improvement plan (PIP) had a disparate adverse impact on plaintiff because of her gender and/or because she has been a mother with older children who required parental attention.

203.    By discriminating against plaintiff on the basis of her gender, the Agency violated Title VII, 42 U.S.C. §§2000e-2(a)(1), 2000e-16(a), (e).

204.    As a result of the Agency's gender discrimination against her, plaintiff has suffered and is suffering considerable injury, including loss of present and future earnings, and mental distress, embarrassment, humiliation, and indignity.

## Count II:  Age Discrimination
### (ADEA)

205.    Plaintiff adopts and incorporates by reference paragraphs 1-204 above.

206.    The ADEA, 29 U.S.C. §§623(a), 633a(a), prohibits employers, including the

Agency, from discriminating against employees on the basis of her age.

207.    In continuously requiring peer reviews of plaintiff's work unnecessarily, giving

her an unacceptable rating on May 13, 2005, and putting her on a performance improvement plan

(PIP) on November 28, 2005, the Agency intentionally discriminated against her because of her

age.

208.    In any event, the Agency's actions in requiring peer reviews of plaintiff's work,

giving plaintiff an unacceptable rating, and putting her on a performance improvement plan (PIP)

had a disparate adverse impact on plaintiff because of her age and/or because she has been an

older mother with older children who required parental attention.

209.    In discriminating against plaintiff on the basis of her age, defendant violated the

ADEA, 29 U.S.C. §§623(a), 633a(a).

210.    As a result of the defendant's age discrimination against her, Plaintiff has suffered

and is suffering considerable injury, including loss of present and future earnings and mental

distress, embarrassment, humiliation, and indignity.

### E.  REMEDIES

211.    WHEREFORE, plaintiff respectfully requests that the Court issue a judgment

granting her the following relief from defendant:

a)    Rescind the PIP and unacceptable evaluation.

b)    Pay her backpay, lost bonuses, and other compensation she lost by virtue of the

unacceptable rating;

c)      Pay her compensatory damages up to the amount of $300,000 under Title VII and the Civil Rights Act of 1991, 42 U.S.C. §§1981a(a)(1),(b)(1)-(2),(b)(3)(D), for maliciously and wrongfully discriminating against plaintiff;

d)      Prejudgment and postjudgment interest thereon, effective;

e)      Reasonable attorneys' fees and costs under Title VII, 42 U.S.C. §§2000e-5(k), 2000e-16(e) and 29 U.S.C. §216(b), 626(b); and

f)      Such other and further relief as to the Court deems just and warranted.

## F.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

212.     On or about June 15, 2005, plaintiff initiated an informal EEO complaint over the reviews of her work and unacceptable performance rating.

213.     On or about September 20, 2005, she filed a formal administrative EEO complaint over the continuing practice of requiring her to submit her work to her peers to review, the unacceptable rating of May 13, 2005, Mr. Breheny's threat of the PIP.

214.     Later, after she received the PIP, plaintiff amended her formal EEO complaint to add allegations that the PIP also discriminated against her on the basis of her gender and age.

215.     On or about June 19, 2006, after an investigation of her administrative complaint, plaintiff elected to have the Equal Employment Opportunity Commission (EEOC) hold a hearing on that complaint.

216.     Thereafter, the case was litigated at the EEOC.

217.     On June 13, 2007, an EEOC administrative judge granted a motion for summary judgment filed by the Agency.

218.    On or about June 28, 2007, the Agency issued a Final Agency Decision (FAD) on plaintiff's complaint, along with a notice that she could file a complaint in court within 90 days after receipt of the FAD.

219.    Plaintiff's counsel received the FAD on or about July 2, 2007.

220.    This complaint is filed within 90 days after said receipt.

## G.  JURY TRIAL DEMAND

221.    Plaintiff requests a jury trial on all issues of fact and damages arising herein.

### VERIFICATION

I hereby certify under penalty of perjury that I am the plaintiff in the above-captioned case; that I have read the foregoing Verified Complaint; and that the facts related herein are true and correct to the best of my knowledge, information, and belief.

Executed at Washington, DC, this _____ day of September, 2007.


_____

JULIA GRIFFITH


Respectfully submitted,


_____

ALAN BANOV #95059
Alan Banov & Associates
8401 Colesville Road, Suite 325
Silver Spring, MD 20910
301-588-9699
Fax: 301-588-9698
abanov@banovlaw.com[1]
Attorney for Plaintiff

---

[1]  Registered in the Court's ECF system as legalrun@aol.com.

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

JULIE GRIFFITH

**DEFENDANTS**

CHRISTOPHER COX, as Chair,
SECURITIES AND EXCHANGE COMMISSION

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 88888
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Alan Banov
Alan Banov and Associates
8401 Colesville Road, Suite 325
Silver Spring, MD 20910

Case: 1:07-cv-01745
Assigned To : Bates, John D.
Assign. Date : 9/28/2007
Description: Employ. Discrim.

*JURY ACTION*

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff
O 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
O 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

O A. *Antitrust*

☐ 410 Antitrust

O B. *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

O C. *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff))
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

O D. *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

O E. *General Civil (Other)*       OR       O F. *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

3

| ○ G. Habeas Corpus/ 2255 | ⊗ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| | | | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) | |
| | *(If pro se, select this deck)* | *(If pro se, select this deck)* | |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| | | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Age and gender discrimination, in violation of 42 U.S.C. 2000e-2, 2000e-3, 2000e-16, and 29 U.S.C. 623, 633a

**VII. REQUESTED IN COMPLAINT**     CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23     **DEMAND $** 300,000+     Check YES only if demanded in complaint     **JURY DEMAND:** YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY**     (See instruction)     YES ☐   NO ☒     If yes, please complete related case form.

DATE Sept. 27, 2007     SIGNATURE OF ATTORNEY OF RECORD     _Alan Dun #98039_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.