UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JULIA GRIFFITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 07-1745 (JDB) |
| | ) | |
| CHRISTOPHER COX, Chairman, | ) | |
| U.S. Securities and Exchange Commission, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

Plaintiff brings this action against Christopher Cox, Chairman, United States Securities and Exchange Commission ("Defendant" or "SEC") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(f) and 16(c) ("Title VII"), and the Age Discrimination Employment Act of 1967, as amended, 29 U.S.C. §§ 626(c) and 633a(c) ("ADEA"), based upon Defendant's alleged gender and age discrimination of Plaintiff. Defendant hereby moves pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted. In addition, Defendant respectfully asks the Court to enter summary judgment in favor of the Defendant, pursuant to Rule 56, because there is no genuine issue of material fact which would prevent a judgment as a matter of law in Defendant's favor.

In support of this Motion, Defendant respectfully refers the Court to the accompanying Memorandum of Points and Authorities, Statement of Undisputed Facts, and attached exhibits. Because this is a dispositive motion, Defendant has not sought Plaintiff's consent. *See* L. Civ. R. 7(m).

Dated: January 2, 2008
      Washington, DC

Respectfully submitted,

_____

JEFFREY A. TAYLOR, D.C. BAR #498610
United States Attorney

OF COUNSEL:
Laura Walker
Senior Counsel
Office of the General Counsel,
U.S. Securities and Exchange Commission

    /s/
_____

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

    /s/
_____

BRIAN P. HUDAK
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 514-7143

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JULIA GRIFFITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No. 07-1745 (JDB) |
| | ) |
| CHRISTOPHER COX, Chairman, | ) |
| U.S. Securities and Exchange Commission, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT**

For the reasons stated below, Defendant Christopher Cox, Chairman, United States Securities and Exchange Commission ("Defendant," "SEC," or "Agency"), hereby respectfully moves, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), to dismiss the complaint ("Complaint") filed by Plaintiff Julia Griffith ("Plaintiff" or "Griffith") in this action.  In addition, Defendant respectfully moves, pursuant to Rule 56, for summary judgment on the totality of Plaintiff's claims.

**PRELIMINARY STATEMENT**

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(f) and 16(c) ("Title VII"), and the Age Discrimination Employment Act of 1967, as amended, 29 U.S.C. §§ 626(c) and 633a(c) ("ADEA"), based upon Defendant's alleged gender and age discrimination of Plaintiff under a disparate treatment theory

of liability.[1]   In essence, Plaintiff alleges that Defendant discriminated against her because Plaintiff, a woman over forty years old, cares for "school-age[d] children."   Compl. at ¶ 44. Plaintiff asserts that Defendant discriminated against her based on such status by (a) requiring that her work be peer reviewed; (b) giving her an "unacceptable" rating in May 2005; and (c) putting her on a performance improvement plan ("PIP") in November 2005.  *Id.* at ¶¶ 201, 207. For a number of reasons Plaintiff's complaint lacks merit.

*First*, summary judgment is proper because Plaintiff filed this action after the statutory limitations period expired.  After Defendant prevailed before an administrative judge ("AJ") of the Equal Employment Opportunity Commission ("EEOC"), on June 28, 2007, Defendant sent Plaintiff and her attorney, by Federal Express Priority Overnight, a Final Action Order, which adopted the findings of the AJ and informed Plaintiff of her rights to file an appeal or a civil action.  Although Plaintiff and her attorney both received the Final Action Order on June 29, 2007, Plaintiff waited until September 28, 2007 (*i.e.*, ninety-one days later), to file this action. Accordingly, pursuant to 42 U.S.C. § 2000e-16(c), Plaintiff's complaint is untimely.

*Second*, dismissal of the Complaint is proper because Plaintiff has failed to state adequately a cognizable claim of discrimination.  That is, the class upon which Plaintiff bases her claims (*i.e.*, a parent with school-aged children) is not a legally recognizable protected class.

---

[1]      Although Plaintiff makes conclusory statements that she also asserts a disparate impact theory of discrimination (*see* Compl. at ¶¶ 144, 202, 208), Plaintiff utterly fails to set forth allegations that could support a *prima facie* case of such discrimination.  Specifically, Plaintiff fails to identify: (i) a specific employment practice that is generally applicable and facially-neutral, but has functioned disproportionately with respect to plaintiff's alleged protected class; or (ii) any statistical or empirical data that may support a disparate impact claim.  Indeed, Plaintiff expressly avers that the alleged discriminatory acts were specifically directed at her on an *ad hoc* basis. *See, e.g.*, Compl. at ¶¶ 49, 158.  Therefore, if Plaintiff's complaint includes disparate impact claims, such claims must fail.  *See Prince v. Rice*, 453 F. Supp. 2d 14, 27 (D.D.C. 2006) (Bates, J.) (dismissing disparate impact claims when plaintiff's complaint failed to adequately allege such claims).  Accordingly, this memorandum principally addresses Plaintiff's disparate treatment claims.

Based on a plain reading of the Complaint, Plaintiff alleges that she was the subject of discrimination not because she was a woman or an individual over 40 years old, but rather because of the work schedule she required as a parent with school-aged children and/or child-rearing responsibilities. Indeed, Plaintiff alleges that her "unique status, being the only woman in the office with school-aged children" (Compl. at ¶ 56), was the characteristic that allegedly subjected her to being singled out for mistakes that all attorneys in her office, "both male and female, over and under 40," commit. *Id.* at ¶ 153. Accordingly, it appears that Plaintiff alleges that she was discriminated against either (i) due to her childcare responsibilities, or (based upon a most generous reading of the Complaint) (ii) being a woman with school-aged children.

Neither of these allegations, however, forms a viable discrimination claim. As to the former, being the parent of or caring for children alone is not a protected status under the discrimination laws. As to the latter, Plaintiff's claim is not sustainable because she cannot plead or show that similarly situated men (*i.e.*, fathers with school-aged children) were treated more favorably than Plaintiff as Plaintiff herself alleges that she was the only person (male or female) in the office with school-aged children. Moreover, Plaintiff cannot sustain an ADEA claim by using the age of her children and their educational needs as a proxy for her own age. Accordingly, Plaintiff's claims should be dismissed.

*Lastly*, dismissal and/or summary judgment is proper on Plaintiff's claims to the extent they are based upon imposing the PIP and/or requiring peer review of Plaintiff's work. These two alleged acts are not adverse employment actions, and thus, are insufficient predicates for discrimination claims.

Therefore, the Motion should be granted.

- 3 -

## SUMMARY OF COMPLAINT AND UNDISPUTED FACTS[2]

### I.    BACKGROUND.

#### A.    Plaintiff Joins the SEC and Is Hired for Her Current Position.

On September 25, 1996, the SEC hired plaintiff as an Attorney-Advisor, GS-905-13/5 in the Health Care and Insurance Group in the Division of Corporation Finance (the "Division"). *See* Compl. at ¶ 9.  In June 1999, Plaintiff applied for a position as a Special Counsel in the Office of Mergers and Acquisitions ("OMA"), and began work in OMA in July 1999.  *Id.* at ¶¶ 21, 27.  In July 1999, Plaintiff turned 42.  *Id.* at ¶ 27.  When Plaintiff joined OMA, the office contained three women and two men in the same position as Plaintiff, including Laura Badian (who was then over 40 years old and a single mother).  *Id.* at ¶¶ 28, 29, 38.  Although none of the Special Counsels in OMA besides Ms. Badian had children as of the time Plaintiff joined the office, Tina Chalk gave birth to her first child in July 1999 and others adopted or had children thereafter.  *Id.* at ¶¶ 28, 29, 38, 54.  Plaintiff, however, was the only individual, male or female, in OMA with school-aged children during the relevant time period.  *Id.* at ¶¶ 44, 56, 87.  Moreover, Plaintiff does not plead that any male Special Counsel had children during the relevant time period.    Upon joining OMA, Dennis Garris, then Chief of OMA, was Plaintiff's first-line supervisor, and Mauri Osheroff was Plaintiff's second-line supervisor.  *Id.* at ¶ 25.  In June 2003, Brian Breheny succeeded Mr. Garris as Plaintiff's first-line supervisor.  When Mr. Brenheny became Chief of OMA, he was 36 years old.  Mr. Brenheny was and remains single without any children.  *Id.* at ¶ 82.

---

[2]    Unless otherwise noted or supported by citation to materials outside the Complaint, this "Background and Summary of Complaint" section and the following "Procedural History" section summarize allegations contained in the Complaint, which Defendant assumes to be true solely for purposes of its motion pursuant to Rule 12(b)(6). Statements that rely upon materials outside the Complaint are also included in Defendant's Statement of Undisputed Facts submitted herewith.

**B.**    <u>**Plaintiff's Various Altered Work Schedules.**</u>[3]

In September 2001, while Mr. Garris was Plaintiff's first-line supervisor, Plaintiff began working an altered work schedule, from 7:00 a.m. to 3:30 p.m., five days a week as a full-time employee.  Compl. at ¶ 43.  Plaintiff alleges that by virtue of being a mother and having school-aged children, Plaintiff required this work schedule to care for her children during the school year.  *Id.* at ¶¶ 43, 44.

In September 2003, Plaintiff requested to change her work schedule, this time to work from 7:30 a.m. to 3:30 p.m. on a part-time, four days a week basis.  *Id.* at ¶ 116.  Mr. Breheny, who had succeeded Mr. Garris by this time, approved Plaintiff's request to work a part-time schedule, but stated that Plaintiff needed to work until 4:00 p.m. on each of those four days.  *Id.* at ¶ 119.  Plaintiff alleges that she accepted this schedule, but that it caused problems for her family.  *Id.* at ¶ 120.  Specifically, Plaintiff alleges that this schedule forced her daughter to stay in after-school care until after 4:00 p.m., which caused problems for her daughter because her daughter needed "time to complete homework in the afternoon."  *Id.* at ¶ 119.

In or about December 2003, Plaintiff again requested a change in her altered work schedule.  *Id.* at ¶ 125.  On this occasion, she asked to work a part-time schedule of three full days and two half days.  *Id.*  Mr. Breheny denied Plaintiff's request, and in January 2004, Plaintiff agreed to a compromise work schedule consisting of three full days, from 7:30 a.m. to 4:00 p.m. Monday to Wednesday.  *Id.* at ¶¶ 126-27.  Plaintiff requested, and eventually accepted,

---

[3]    Although Plaintiff sets forth a plethora of allegations concerning her altered work schedule and the need for such schedule due to her childcare responsibilities, Plaintiff has not asserted a claim based upon Defendant's refusal to provide her an altered work schedule of her choosing.  Accordingly, such allegations are not directly relevant to Plaintiff's claims.  Defendant, however, summarizes such allegations as Plaintiff notably concedes that her altered work schedules were a necessity of her childcare responsibilities (and not of her gender or age) and, at times, prevented her from timely performing her work.

this schedule change in order to teach a course at Georgetown University Law Center.  *Id.*  at ¶ 128.  As a result of this schedule change, Plaintiff concedes that her SEC work "was sometimes delayed."  *Id.* at ¶ 129.  After Plaintiff finished teaching her course, she remained on the three-day, part-time schedule "to spend more time with her younger child, who was struggling with the increased homework demand and needed parental supervision after school."  *Id.* at ¶ 133.

In August 2004, Plaintiff once again requested that Mr. Breheny allow her to change her work schedule in anticipation of her childcare responsibilities that would begin with the new school year.  *Id.* at ¶ 134.  Specifically, Plaintiff requested that she be allowed to work full-time, five days a week, from 7:00 a.m. to 3:30 p.m. each day.  *Id.* at ¶ 134.  Mr. Breheny denied her request to work from 7:00 a.m. to 3:30 p.m. each day (*id.* at ¶ 135), but, as Plaintiff admitted before the AJ, Mr. Breheny granted her request to return to a full-time schedule.  *See* Compl't Resp. to the Agency's Stmt. Of Undisp. Facts ("Pl's Admin. Resp. Undisp. Facts") at 6, attached hereto at Ex. 1 ("Attached Ex. 1").[4]

Lastly, in May 2005, Plaintiff requested, and Mr. Breheny granted, a six-month leave of absence to address her younger child's distress related to school.  Compl. at ¶ 146.  As Plaintiff admitted before the AJ, in November 2005, Plaintiff returned to her 24 hours per week schedule, working Monday to Wednesday, 7:30 a.m. to 4:00 p.m.  *See* Pl's Resp. Undisp. Facts at 6, Attached Ex. 1.

---

[4]      This Response to the Agency's Statement of Undisputed Facts was rejected by the EEOC AJ because it was not timely filed.  *See* Letter from AJ Henry to A. Banov of 05/07/2007 (without attachments) at 2, Attached Ex. 2.  Although Plaintiff never verified its contents, such response is properly viewed as an admission because it was submitted on Plaintiff's behalf and signed by Plaintiff's attorney.  *See Hanson v. Waller*, 888 F.2d 806, 814 (11th Cir. 1989) (attorney's statements are attributable to client and are subject to the exemption from hearsay as party admissions).

Accordingly, it is clear that Plaintiff's altered work schedule resulted from her childcare responsibilities as a parent with school aged-children.

## II.    ALLEGED DISCRIMINATORY ACTS.

### A.    Peer-Review of Plaintiff's Work.

Plaintiff alleges that at the time she joined OMA in July 1999, the Chief of the office or his designee reviewed all work of all new Special Counsels for a period of up to one year. Compl. at ¶ 37.  In or about Fall 2001, Mr. Garris decided that Plaintiff's work would continue to be reviewed before it was circulated outside of OMA.  *Id.* at ¶ 45.  Mr. Garris designated Special Counsels Nick Panos, Pam Carmody and Ms. Chalk to conduct such review of Plaintiff's work. *Id.* at ¶ 47.  Mr. Panos, Ms. Carmody and Ms. Chalk were in the same position as Plaintiff and were all, at the time, under 40 years old.  *Id.* at ¶ 28.  Ms. Chalk and Ms. Carmody had children, but they were not yet of school-age.  *Id.* at ¶ 54.

This peer review of Plaintiff's work continued intermittently for the remainder of Mr. Garris' tenure with the SEC -- *i.e.*, until March 2003.  *Id.* at ¶ 52.  In addition to the peer review process, Plaintiff alleges that Mr. Garris assigned more work to Plaintiff than she could appropriately consider in her work time.  *Id.* at ¶¶ 56-58.  That is, unlike the other OMA Special Counsel, who did not have children of school-age, Plaintiff, "by virtue of her unique status, being the only woman in the office with school-aged children, [ ] could not stay late and still meet the needs of her family."  *Id.* at ¶ 56.  Plaintiff further alleges that due to (i) childcare responsibilities, (ii) the work assigned to her by Mr. Garris, and (iii) the peer review system, she was left with less time than her peers to complete her work.  *Id.* at ¶ 58.  Notably, Plaintiff

implies that this situation was unfair, not because of her age or gender, but because of the work situation she required as a parent with school-aged children.

From March 2003, when Mr. Garris went on leave and ultimately left the SEC, until June 2003, when Mr. Breheny was hired, Ms. Carmody and Mr. Panos reviewed some of Plaintiff's work. *Id.* at ¶¶ 71-76. According to Plaintiff, Mr. Garris recommended to Ms. Osheroff that all of Plaintiff's work be reviewed for the then foreseeable future. *Id.* at ¶¶ 77. In August 2003, after Mr. Breheny became Plaintiff's supervisor, Plaintiff asked when peer review of her work would cease. *Id.* at ¶ 93. Mr. Breheny responded that he wanted to resolve the review situation and would review her work for a period of six weeks in order to establish criteria to end the peer review. *Id.* at ¶ 98. At the end of six weeks, Mr. Breheny decided that Plaintiff's work should be reviewed for an additional three months. *Id.* at ¶ 105. In June 2004, Mr. Breheny informed Plaintiff that her work would continue to be reviewed by her peers. *Id.* at ¶ 132.

Plaintiff alleges that by asking peers to review her work, Mr. Breheny has promoted peer criticism of Plaintiff's work. *Id.* at ¶ 111. That is, Plaintiff alleges that her peers are incentivized to find problems with her work because the pool of money available for bonuses among Special Counsel is limited, and if they give a negative review of her work they might receive more money. *Id.* at ¶ 111. Plaintiff, however, fails to allege that any of her peer reviews were actually inaccurate or increased her peer's bonuses to her detriment. Plaintiff also alleges that Mr. Breheny's maintenance of the peer review program has made it more difficult for Plaintiff to meet her deadlines, which in turn has provided Mr. Breheny and her other supervisors a pretext to complain about her work being too slow. *Id.* at ¶¶ 112-14, 129-32.

Despite noting that her supervisors often questioned the quality of her work (*see, e.g.*, *id.* at ¶¶ 53 (Fall 2001), 62 (August 2002), 68 (March 2003), 145 (March 2004)); and conceding that her work schedule and her childcare duties at times caused her work to be delayed (*id.* at ¶¶ 129, 151-52), Plaintiff avers that the imposition and maintenance of this peer review program was without explanation. *Id.* at ¶ 106. Plaintiff, thus, appears to conclude that the peer review program was an act of discrimination against her based upon the schedule she required due to "her unique status [of] being the only woman in the office with school-aged children" (*id.* at ¶¶ 56), "which was a by-product of her [ ] age." *Id.* at ¶ 44. Indeed, Plaintiff alleges the following as to Mr. Garris' conduct:

> Mr. Garris's approach to plaintiff reflected both gender stereotypes and an age bias. Thus, his actions indicated that he was dissatisfied with the amount and quality of plaintiff's work, and he made unfavorable references to people who "fly out the door" at the end of their workdays; he told plaintiff that other people, including single people suffering from cancer, had heavy demands on them, too, and managed to make it work. He compared plaintiff with employees with younger children whose childcare arrangements differed from plaintiff's, and said that Ms. Griffith "should be able to work it out." Mr. Garris refused to discuss schedule changes or workload changes that would have allowed plaintiff to perform her job more easily, and he refused to consider that, with respect to compulsory overtime, an employee in her forties with school-aged children was differently situated from a younger employee with no children. Mr. Garris' pejorative view of Ms. Griffith as someone who left promptly at the end of her scheduled workday in order to meet family demands had a negative effect on his perception of her and his perception of her work.

*Id.* at ¶ 57. Plaintiff makes this incredible logical leap despite admitting that at least one other OMA attorney, a male, had his work reviewed beyond his first year with OMA (*id.* at ¶ 108); and noting that other employees who are mothers are not subject to peer review programs. *Id.* at ¶¶

- 9 -

108, 153.  Notably, Plaintiff does not, and cannot, allege that a father in OMA with school-aged children was treated more favorably than her, as Plaintiff concedes that no other OMA attorney (male or female) had school-aged children during the relevant period.  *Id.* at ¶ 87.

In conclusion, Plaintiff alleges that the "discriminatory peer review practice" caused Plaintiff considerable anxiety, stress, emotional distress; humiliated her in front of her colleagues; and caused her to lose the stature a lawyer and regulator in her position would otherwise command.  *Id.* at ¶¶ 174-76.

B.     **The May 2005 "Unacceptable" Performance Evaluation**

On or about May 13, 2005, Mr. Breheny allegedly gave Plaintiff a performance evaluation (the "May 2005 Performance Evaluation") with an "Unacceptable" rating for the fiscal year ending in Spring 2005.  Compl. at ¶ 147.  Specifically, Mr. Breheny rated Plaintiff "Acceptable" on "Execution of Duties," but "Unacceptable" on "Planning and Organizing Work."  *Id.*  Although Plaintiff admits that (i) her work was occasionally delayed (*id.* at ¶¶ 151-52); (ii) she made certain mistakes (*id.* at ¶¶ 153-56); and (iii) missed certain legal issues (*id.* at ¶¶ 159-62), she alleges that the performance evaluation was discriminatory and held her to a higher standard than others in the office.  *Id.* at ¶¶ 149-50, 158.  Plaintiff appears to allege that Mr. Breheny gave her this unfair review to discriminate against her based on the work schedule she required due to her childcare responsibilities.  *See id.* at ¶¶ 167-70, 190-98, 202, 209.  Plaintiff further alleges that the "Unacceptable" rating prevented plaintiff from receiving a step increase in salary for fiscal year 2005 and subsequent years, despite being rated "Acceptable" by Mr. Breheny in fiscal years 2006 and 2007.  *Id.* at ¶ 179.

**C.    The November 2005 PIP.**

After receiving her "Unacceptable" performance evaluation in May 2005, Plaintiff took a six month leave of absence to address her younger child's distress related to school.  Compl. at ¶ 146.  Upon returning from her leave of absence, Plaintiff was placed on a PIP for a period of 120 days (the "November 2005 PIP").  *Id.* at ¶ 171.  The PIP was automatically triggered by the May 2005 Performance Evaluation.  *Id.* at ¶ 173.  Plaintiff alleges that the PIP did not refer to substantive issues with the quality of her work, but rather the timing of her work and communications problems with Mr. Breheny.  *Id.* at ¶ 172.  In June 2006, Mr. Breheny removed Plaintiff from the PIP and noted that Plaintiff had made "great improvement" and "taken it up a level."  *Id.* at 187.  Before the AJ, Jeanine Lauth, Chief of the Program Administration Branch in the Division of Corporation Finance of the SEC, confirmed that Plaintiff's official personnel file does not contain any record of the November 2005 PIP.  *See* Lauth Decl. of 02/14/2007 (without exhibits) at ¶ 9, Attached Ex. 3.

## PROCEDURAL HISTORY

On or about June 25, 2005, Plaintiff initiated an informal EEO complaint regarding the May 2005 Performance Evaluation.  Compl. at ¶ 212.  On or about September 20, 2005, Plaintiff filed a formal administrative EEO complaint concerning the peer review process, the May 2005 Performance Evaluation, and the then-threatened November 2005 PIP.  *Id.* at ¶ 213.  Later, Plaintiff amended her formal EEO complaint to include allegations concerning the imposition of the November 2005 PIP.  *Id.* at ¶ 214.  On or about June 19, 2006, after an investigation of her formal complaint, plaintiff elected to have the EEOC conduct a hearing on that complaint.  *Id.* at

¶ 215.  After litigating the case before the EEOC for nearly a year, the EEOC AJ granted Defendant's motion for summary judgment.  *Id.* at ¶¶ 216-17.

By letter dated June 28, 2007, the SEC issued a Final Action Order ("FAO") on Plaintiff's administrative complaint, adopting the findings of the EEOC AJ.  *Id.* at ¶ 218; Letter from D. Balducchi to A. Banov of 06/28/2007, attaching FAO at 1-2, Attached Ex. 4.  This FAO included an express notice that Plaintiff had the right to file a civil action with respect to the FAO within 90 days of receipt of the FAO.  Compl. at ¶ 218; FAO at 3, Attached Ex. 4.

Plaintiff pleads that her counsel received the FAO on or about July 2, 2007, and alleges that the Complaint was filed within 90 days of such receipt.  Compl. at ¶ 219-20.  This allegation, however, is conclusively refuted by the attached Declaration of Fran Paver and Federal Express tracking information attached hereto.  *See* Paver Decl., Attached Ex. 5; Federal Express Tracking Information, Attached Exs. 6, 7.  This undisputable evidence clearly shows that Plaintiff and her counsel both received the FAO on June 29, 2007.  That is, Ms. Paver confirms that copies of the FAO were sent by FedEx Priority Overnight to Plaintiff and her counsel, using air bills with FedEx tracking numbers 8618 9250 6020 and 8618 9250 6031, respectively.  *See* Paver Decl. at ¶¶ 4, 5 and Exs. B, C, Attached Ex. 5.  The Federal Express Tracking Information attached hereto,[5] shows that Federal Express packages bearing those tracking numbers were delivered as follows:

- Attached Exhibit 6 (tracking information for the package addressed to Mr. Banov) confirms that the package with Federal Express tracking number 8618 9250 6031

---

[5]      Attached Exhibits 6 and 7 were retrieved on December 28, 2007, by the undersigned defense counsel from http://www.federalexpress.com/us/ (*i.e.*, Federal Express' U.S. homepage) by inputting the FedEx tracking numbers on the air bills attached to the Declaration of Fran Paver, which is one of various methods Federal Express provides for customers to track their shipments.  *See* FedEx Service Info - Tracking, Attached Ex. 8 (retrieved as indicated by undersigned counsel).  Each exhibit contains (i) a proof of delivery letter, and (ii) a printout of tracking information.

was delivered to Mr. Banov's office at 12:23 p.m. on June 29, 2007, and signed for by S. Epps; and

- Attached Exhibit 7 (tracking information for the package addressed to Ms. Griffith) confirms that the package with Federal Express tracking number 8618 9250 6020 was delivered to Ms. Griffith's home at 9:15 a.m. on June 29, 2007.

Accordingly, based upon the irrefutable evidence attached hereto, Plaintiff and her counsel received the FAO on June 29, 2007. Therefore, because Plaintiff's Complaint was filed on September 28, 2007, Plaintiff brought this action ninety-one days after receipt of the FAO. Accordingly, for the reasons stated below, Plaintiff's claims are time barred.

## **ARGUMENT**

Applying the standards for motions under Rules 12(b)(6) and 56 to the aforementioned allegations and undisputed facts compels dismissal of and/or summary judgment on Plaintiff's claims.

## I.   **THE STANDARDS FOR MOTIONS UNDER RULES 12(b)(6) AND 56.**

### A.   **The Legal Standard for Dismissal Under Rule 12(b)(6).**

As this Court has recognized:

> In passing on a motion to dismiss . . . the allegations of the complaint should be construed favorably to the pleader. Therefore, the factual allegations must be presumed true, and plaintiffs must be given every favorable inference that may be drawn from the allegations of fact. However, the Court need not accept as true a legal conclusion couched as a factual allegation, nor inferences that are unsupported by the facts set out in the complaint.

*Bryant v. United States*, --- F. Supp. 2d ---, 2007 WL 4465509, at *2 (D.D.C. December 21, 2007) (Bates, J.) (granting motion to dismiss) (citations and internal quotation marks omitted). The Rules merely require a Complaint to contain a short and plain statement of a plaintiff's claims in order "'to give the defendant fair notice of what the . . . claim is and the grounds upon

- 13 -

which it rests.'" *Id.*, *quoting Bell Atl. Corp. v. Twombly,* 550 U.S. ----, 127 S.Ct. 1955, 1964 (2007).  However, "a plaintiff must furnish more than labels and conclusions or a formulaic recitation of the elements of a cause of action.  Instead, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bryant*, 2007 WL 4465509, at *2 (citations and internal quotation marks omitted).  For the reasons stated below, when the Court applies this standard to Plaintiff's claims the Complaint should be dismissed because Plaintiff has failed to state a cognizable claim under Title VII or the ADEA and certain of Plaintiff's claims are premised upon non-adverse employment actions.

**B.**    **The Legal Standard for Summary Judgment Under Rule 56.**

"Summary judgment is appropriate when the pleadings and the evidence demonstrate that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kilby-Robb v. Spellings*, --- F. Supp. 2d. ---, 2007 WL 4142750, at *4 (D.D.C. Nov. 23, 2007) (Bates, J.), *quoting* Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the initial responsibility of showing an absence of a genuine issue of material facts.  *Id.*  In deciding whether a genuine issue of material facts exists, the court must "accept all evidence and make all inferences in the non-movant's favor."  *Id.*, *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  "A non-moving party, however, must establish more than the mere existence of a scintilla of evidence in support of its position."  *Id.* (citations and internal quotation marks omitted).  That is, "'[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.*, *quoting Anderson,* 477 U.S. at 249-50.  Applying this standard to the Complaint, Plaintiff's claims should be dismissed as the

- 14 -

undisputed evidence shows that Plaintiff failed to file the Complaint within the statutory limitations period.

## II.    PLAINTIFF FILED THE COMPLAINT AFTER THE LIMITATIONS PERIOD EXPIRED.

If a federal employee wishes to bring a civil action under Title VII, s/he must file a civil complaint within 90 days after receiving notice of final action on his/her respective administrative complaint.  *See* 42 U.S.C. § 2000e-16(c); *accord Howard v. Gutierrez*, 474 F. Supp. 2d 41, 51 (D.D.C. 2007) (Bates, J.).  Civil actions pursuant to the ADEA are subject to the same requirement.  *Price v. Bernanke*, 470 F.3d 384, 389 (D.C. Cir. 2006) ("[W]e hold that when federal employees bring a civil action after pursuing administrative remedies under the ADEA, the action must be brought within 90 days of final agency action, the time period allowed for similar suits under Title VII.").  "Courts apply this limit strictly and 'will dismiss a suit for missing the deadline by even one day.'"  *Woodruff v. Peters*, 482 F.3d 521, 525 (D.C. Cir. 2007), *quoting Wiley v. Johnson,* 436 F. Supp. 2d 91, 96 (D.D.C. 2006) (Collyer, J.) (granting summary judgment in favor of defendant when plaintiff filed her Title VII complaint more than 90 days after receiving notice of final agency action).  Indeed, a number of actions have been dismissed when a plaintiff filed his/her complaint one or two days after the 90 day limitations period expired.  *See, e.g.*, *Smith v. Dalton*, 971 F. Supp. 1, 3 (D.D.C. 1997) (Robertson, J.) (granting summary judgment when Title VII complaint was one day late); *Wolfe v. Danzig*, No. 00-CV-1458, 2001 WL 1661479, at *4 (D.D.C. June 1, 2001) (Kay, Magistrate J.) (same); *Jackson v. Snow*, No. Civ. A. 05-1266, 2006 WL 212136, at *4 (D.D.C. Jan. 27, 2006) (Kollar-Kotelly, J.) (same); *Colbert v. Potter*, 471 F.3d 158, 167 (D.C. Cir. 2006) (affirming grant of summary judgment when Title VII complaint was two days late); *Bass v. Bair*, 514 F. Supp. 2d 96,

- 15 -

99 (D.D.C. Oct. 16, 2007) (Kessler, J.) (granting summary judgment when Title VII complaint was two days late).

The undisputed facts in this case show that the FAO was delivered and received by both Plaintiff and her counsel on Friday, June 29, 2007. Accordingly, Plaintiff had until Thursday, September 27, 2007 (*i.e.*, ninety days later), to file a civil action. Plaintiff, however, filed the Complaint on September 28, 2007 -- *i.e.*, ninety-one days after receiving the FAO and one day after the limitations period had run. Therefore, the Complaint is untimely and summary judgment is proper on Plaintiff's claims.[6]

## III.    PLAINTIFF HAS FAILED TO PLEAD SUFFICIENTLY A CLAIM OF DISCRIMINATION.

Under the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 793 (1973), "[t]o succeed on a claim of discrimination under Title VII, plaintiff has the initial burden of establishing a *prima facie* case of discrimination." *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 71-72 (D.D.C. Nov. 23, 2007) (Huvelle, J.). "In order to make out a prima facie case of discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference

---

[6]    Although Title VII's 90 day limitations period is subject to equitable tolling, it is inappropriate in this action. That is, Plaintiff has failed to allege any facts or circumstances that could permit equitable tolling of her limitations period. Indeed, courts only sparingly grant equitable tolling, and do not apply equitable tolling when a plaintiff failed to exercise due diligence in preserving their legal rights; garden variety excusable neglect will not suffice. *See Colbert*, 471 at F.3d 167 ("Federal courts have typically extended equitable relief only sparingly[.]") (internal quotation marks and citations omitted); *Wiley*, 436 F. Supp. 2d at 96 ("to apply equitable tolling, the plaintiff must have exercised due diligence and his excuse for the delayed filing must be more than a garden variety claim of excusable neglect. The burden of pleading and proving any equitable excuse for failure to meet the ninety-day filing limit falls wholly upon the plaintiff.") (citations and internal quotation marks omitted); *Bass*, 514 F. Supp. 2d at 99 ("[e]quitable tolling does not apply where the claimant failed to exercise due diligence in preserving his legal rights. The plaintiff has the burden of pleading and proving any equitable reasons for his or her failure to comply with Title VII's time requirements.") (internal quotation marks and citations omitted); *Dalton*, 971 F. Supp. at 3 ("[t]he tolling power is to be exercised only in extraordinary circumstances[.]"). Indeed, this is not the first time Plaintiff, while represented by counsel, has attempted to untimely file papers concerning this matter. *See, supra*, at n. 4.

of discrimination."[7]  *Kilby-Robb*, 2007 WL 4142750, at *4 (citations and internal quotation marks omitted).[8]  "Although Title VII plaintiffs need not plead each element of this *prima facie* case to survive a motion to dismiss, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 515 (2002), . . . Courts can, [ ] explore the plaintiff's *prima facie* case at the dismissal stage to determine whether the plaintiff can *ever* meet his initial burden to establish a *prima facie* case for Title VII discrimination."  *Rattigan*, 503 F. Supp. 2d at 71 (citations and internal quotations omitted).

### A.    Plaintiff's Gender Discrimination Claim Fails.

As noted above, Plaintiff's allegations amount to a claim that she was indirectly discriminated against because she was a parent with school-aged children,[9] not that she was discriminated against because of her gender.  Even if Plaintiff's claim can be viewed as one

---

[7]    Similarly, "[t]o establish a prima facie case of age discrimination, plaintiff must demonstrate facts sufficient to create a reasonable inference that age discrimination was a 'determining factor' in the employment decision.  Such an inference is created if the plaintiff shows that: (1) he belongs to the statutorily protected age group ( *i.e.,* forty to seventy years of age); (2) he was qualified for his position and was performing his job well enough to meet his employer's legitimate expectation; (3) he suffered an adverse employment action despite his qualifications and performance; and (4) he was disadvantaged in favor of similarly-situated younger employees."  *Spelke v. Gonzales*, 516 F. Supp. 2d 76, 80 (D.D.C. 2007) (Leon, J.) (citations and internal quotation marks omitted).

[8]    The framework continues by shifting the parties' respective burdens.  "If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  *McDonnell Douglas,* 411 U.S. at 802. The employer's burden, however, is merely one of production."  *Id.*  "If the employer is successful, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination or retaliation."  *Id.*  As noted above, Plaintiff herself admits that she was late on some assignments and her childcare responsibilities made it difficult to finish the technical and complex work of her job on time.  Compl. at ¶¶ 151-56.  Accordingly, Defendant had a legitimate, non-discriminatory rationale for taking the alleged discriminatory acts.

[9]    Standing alone the fact that Plaintiff takes care of or has children of school-age is not, in and of itself, a protected class or a proxy for a protected class.  Indeed, numerous courts have held that childcare, which can be done by a parent of either sex, is not an inherently sex-specific characteristic, such that discrimination on the basis of childcare responsibilities necessarily constitutes discrimination on the basis of sex.  *See Fisher v. Vassar College*, 70 F.3d 1420, 1446-47 (2d Cir. 1995) (lengthy absence from work to care for children could be considered by employer in promotion decision); *Guglietta v. Marriot Corp.*, 301 F. Supp. 2d 209, 213-14 (D. Conn. 2004) (as a legal matter childcare is a gender-neutral activity); *Barnes v. Hewlett-Packard Co.*, 846 F. Supp. 442 (D. Md. 1994) (request for parental leave, as opposed to pregnancy leave, was not gender-based, and thus, not protected under Title VII); *Record v. Mill Neck Manor Lutheran Sch. for the Deaf*, 611 F. Supp. 905, 907 (E.D.N.Y. 1985) (same).

premised upon gender discrimination, Plaintiff merely states a legally insufficient claim of "sex-plus" gender discrimination.

When a plaintiff alleges that s/he was discriminated against not only because of his/her gender, but also due to another characteristic, plaintiff has stated a sex-plus claim. "In a 'sex plus' case an employer does not discriminate against a protected class as a whole, but rather disparately treats a subclass within a protected class." *Spirides v. Reinhardt*, 486 F. Supp. 685, 688 (D.D.C. 1980), *citing Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (holding that Title VII was violated where the employer treated women with children of preschool age differently than men in similar circumstances). In order to establish a sex-plus claim, a plaintiff must show that those of the other gender with the same "plus" characteristic received better or different treatment. *Fisher v. Vassar College*, 70 F.3d 1420, 1446-47 (2d Cir. 1995) (rejecting plaintiff's sex-plus claim and finding that because child-rearing is not sex specific, a Title VII claim does not lie when a policy discriminates "between those who take off time to raise their children and those who either do not have children or are able to raise them without an appreciable career interruption"); *Bryant v. Int'l Sch. Servs., Inc.*, 675 F.2d 562, 575 (3d Cir. 1982) (finding that plaintiffs failed to prove their sex-plus "married woman" claim, because plaintiffs failed to show "that married males, in circumstances similar to [plaintiffs], received better, or even different treatment"); *Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 432 (6th Cir. 2004) ("In a 'sex-plus' or 'gender-plus' case, the protected class need not include all women but the plaintiff must still prove that the subclass of women was unfavorably treated *as compared to the corresponding subclass of men*. Absent such a subclass, a plaintiff cannot

establish sex discrimination.") (emphasis in original) (citations and internal quotation marks omitted).

As noted above, Plaintiff cannot plead that a father in OMA with school-aged children was treated differently than Plaintiff because Plaintiff concedes that no such father was present in OMA during the relevant period. This is fatal to Plaintiff's Title VII claim. Accordingly, Plaintiff cannot state a claim for sex-plus gender discrimination, and thus, her Title VII claim must fail.

### B.   **Plaintiff's Age Discrimination Claim Fails.**

Similarly, Plaintiff's ADEA claim must fail. As noted above, Plaintiff alleges that she was the subject of discriminatory acts because of the work schedule she required as a parent with school-aged children. Plaintiff alleges that this work schedule was a by-product of or proxy for her own age. Compl. at ¶ 44. This contention, however, fails as a matter of law. As the Supreme Court noted in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993), "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." *Id.* (holding that years of service was not an acceptable proxy for age).

## IV.   THE PEER REVIEW PROCESS AND NOVEMBER 2005 PIP ARE NOT ACTIONABLE ADVERSE EMPLOYMENT ACTIONS.

As noted above, in order to sustain a Title VII or ADEA claim, Plaintiff must, among other things, show that she was subject to adverse employment actions as a result of discrimination. *See Kilby-Robb*, 2007 WL 4142750, at *4. As this requirement is part of Plaintiff's *prima facie* case, the Court may examine the Complaint to determine whether Plaintiff can ever prove that the alleged discriminatory acts were adverse employment actions.

- 19 -

Accordingly, courts have rejected claims at the dismissal stage when they are not based upon adverse employment actions.  *See, e.g., Rattigan*, 503 F. Supp. 2d at 72-73.

For purposes of a Title VII or ADEA claim, adverse actions are defined as follows:

> [A]n employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find *objectively tangible harm*." *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citing *Brown v. Brody,* 199 F.3d 446, 452 (D.C. Cir. 1999)) (emphasis added). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi,* 257 F.3d 815, 818 (D.C. Cir. 2001) (internal quotation marks omitted). "Mere idiosyncracies of personal preference are not sufficient to state an injury."  *Brown*, 199 F.3d at 457. Accordingly, the D.C. Circuit has defined an adverse employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)

*Rattigan*, 503 F. Supp. 2d at 72.  Under this test the alleged peer review process and November 2005 PIP are not adverse actions.

As to the peer review process, Plaintiff does not allege that she suffered any significant change in her employment status as a result of the review process.  Indeed, numerous courts have held that scrupulously monitoring an employee's work is not an adverse action.  *See, e.g.*, *Lester v. Natsios*, 290 F. Supp. 2d 11, 30 (D.D.C. 2003) (Bates, J.) ("being closely supervised or 'watched' does not constitute an adverse employment action that can support a claim under Title VII.); *Rattigan*, 503 F. Supp. 2d  at 72 ("Being subject to 'scrupulous monitoring' does not constitute an adverse action because it is part of the employer's job to ensure that employees are

safely and properly carrying out their jobs.") (citations and internal quotation marks omitted). Accordingly, the peer review process was not an adverse action.

The November 2005 PIP is likewise insufficient.  Plaintiff does not allege that she suffered any tangible employment detriment by being placed on the PIP.  Instead, Plaintiff alleges that as a result of the PIP she suffered stress, anxiety, emotional distress, loss of stature, humiliation, and undefined threats to her livelihood.  Compl. at ¶¶ 174-77.  Moreover, as noted above, Plaintiff's employee personnel file contains no mention of the November 2005 PIP. Accordingly, the PIP is not an adverse action.  *See, e.g.*, *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (affirming grant of summary judgment, concluding PIP was not adverse).

*    *    *

## CONCLUSION

For the reasons stated above, Defendant respectfully asks this Court to dismiss the Complaint and/or grant summary judgment in Defendant's favor on the totality of Plaintiff's claims.

Dated: January 2, 2008
        Washington, DC

                                        Respectfully submitted,


                                        _____
                                        JEFFREY A. TAYLOR, D.C. BAR #498610
                                        United States Attorney

OF COUNSEL:
Laura Walker
Senior Counsel
Office of the General Counsel,                    /s/
U.S. Securities and Exchange Commission  _____
                                        RUDOLPH CONTRERAS, D.C. BAR #434122
                                        Assistant United States Attorney


                                                 /s/
                                        _____
                                        BRIAN P. HUDAK
                                        Assistant United States Attorney
                                        555 4th Street, NW
                                        Washington, DC 20530
                                        (202) 514-7143

                                        *Attorneys for Defendant*

- 22 -

# EXHIBIT
# 1

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

JULIA E. GRIFFITH,                            )
                                              )
        Complainant,                          )
                                              )
        v.                                    ) EEOC Docket No. 570-2006-00464X
                                              ) SEC File No. 20-05-05
CHRISTOPHER COX,                    -         ) Judge Varice Henry
as and in his capacity as                     )
CHAIRMAN OF THE                               )
SECURITIES & EXCHANGE COMMISSION,             )
                                              )
Agency.                                       )
                                              )
———————————————————————————————————           )

## COMPLAINANT'S RESPONSE TO
## THE AGENCY'S STATEMENT OF UNDISPUTED FACTS

Complainant Julia Griffith, by her undersigned attorney, hereby responds to the Agency's

Statement of Undisputed Facts:

### I. Introduction

Most of the facts stated in that Statement are indeed undisputed, as explained below, but

many are not material to the issues before the Commission; i.e., whether the Agency

discriminated against the Complainant on the basis of her age, gender, or both, in

    (1) requiring her to submit her filings to her peers to review;

    (2) giving her an unacceptable evaluation; and

    (3) placing her on a 120-day PIP.

### II. Response to Specific Statements

1. Julia Griffith ("Complainant") is a Grade 14 Special Counsel in the Office of Mergers
and Acquisitions ("OMA") in the Agency's Division of Corporation Finance (the "Division").

RESPONSE:  Admitted.

2. Complainant began working in OMA in July 1999.

2

RESPONSE:  Admitted.

3. As a Special Counsel in OMA, Complainant's duties include, among other things, reviewing and writing comment letters on certain filings, such as tender offers and proxy statements, by companies under the Securities Exchange Act of 1934.

RESPONSE:  Admitted.

4. Comment letters generally must be completed under very tight deadlines, so that the investing public receives information on transactions in a timely manner.

RESPONSE:  Admitted, but denied that the deadlines are required by any statute or regulation.

Rather, they are based on agency custom. See ROI, Tab F-1, Tr. 14-15; Breheny Depo. 142-145.

Complainant also denies that the investing public is denied information if the deadlines are not met. All tender offer documents reviewed by OMA are sent to investors before they are reviewed, and all proxy statements and tender offers are publicly filed on the EDGAR system prior to review. Proxy statements are finalized and sent to investors when the review is complete, and while it is undesirable to delay a meeting because a proxy statement is being reviewed, no meeting date is set until after the review is complete and the final proxy statement is sent to investors. A required legend on the front page of many of the documents OMA reviews states, "Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the transaction; passed upon the merits or fairness of the transaction; or passed upon the adequacy or accuracy of the disclosure in the document." The legend also must make it clear that any representation to the contrary is a criminal offense. See Rule 13e-3(e)(iii), Exchange Act of 1934; 17 CFR Ch.II §. 3e-3(e)(iii). Complainant does not believe that any investors have ever been harmed by a delayed proxy review process involving OMA, including those conducted by Complainant. See ROI, Tab F-1, Tr. 24; ROI, Tab F-1A, pp. 3-4, 7.

3

5. Between July 1999 and the spring of 2003, Ms. Griffith's supervisor was Dennis Garris, who was then Chief of OMA.

RESPONSE: Admitted that Mr. Garris was her immediate supervisor during that period.

6. Since July 2003, Ms. Griffith's supervisor has been Brian Breheny, the current Chief of OMA.

RESPONSE: Admitted that Mr. Breheny has been her immediate supervisor during that period.

7. Mr. Breheny's supervisor is Mauri Osheroff, who is an Associate Director in the Division.

RESPONSE: Admitted.

8. At the time Complainant filed her complaint (and at the time of the Agency's EEO investigation), there were seven Special Counsels in OMA, besides Complainant: Christina Chalk, Pamela Carmody, Celeste Murphy, Abby Adams, Mara Ransom, Nicholas Panos and Michael Pressman.

RESPONSE: Admitted. However, now with Ms. Murphy on maternity leave and Abby and since Ms. Adams and Mara Ransom have left, there are now three women and five men in the office.

9. Mr. Panos and Mr. Pressman are male; Mses. Chalk, Carmody, Adams, Ransom, and Murphy are female.

RESPONSE: Admitted.

10. In March 2006, Daniel Duchovny (male) also became a Special Counsel in OMA.

RESPONSE: Admitted.

11. Mses. Chalk, Carmody, and Murphy are all mothers.

RESPONSE: Admitted.

12. Mr. Duchovny became a father in July 2006 and is the only father in OMA.

RESPONSE: Admitted, but Complainant notes that this was after the most relevant time period of this case.

4

13. At all times from September 27, 2005 to the present, Mses. Chalk, Carmody and Murphy have all either worked part-time, on an altered work schedule, or both. Between July of 2003 and January of 2006, both Ms. Carmody and Ms. Chalk continuously worked part-time (except when Ms. Carmody was out altogether on maternity leave).

RESPONSE:  Admitted.

14. Mr. Panos and Mr. Pressman also work altered schedules, as did Ms. Adams while she still worked at the Commission.

RESPONSE:  Admitted. However, Mr. Pressman works 10-6; Mr. Panos works a compressed

work week, so he can do an executive MBA program in NY on the weekends; Mr. Breheny has

accommodated everyone's schedule except for Complainant; and no one but she has asked to

leave before 4 p.m.

15. Mr. Breheny's administrative assistant, Venita Hall, also works an altered schedule and is a mother.

RESPONSE:  Admitted, but this is not relevant since Ms. Hall is not an attorney or special

counsel.

16. The only people in OMA currently who do not work either part-time or on an altered schedule are Mr. Duchovny, Mr. Breheny, and Adelaja Heyliger.

RESPONSE:  Admitted. Mr. Breheny works from 9:30 a.m. to 6 p.m.

17. Ms. Carmody, Ms. Chalk, Ms. Murphy and Ms. Hall – all of the mothers in the office other than Complainant – asked for their altered and part-time schedules to accommodate childcare needs.

RESPONSE:  Complainant does not have direct knowledge of whether this is true or false.

18. Complainant's schedule has changed numerous times, at her own request, since Mr. Breheny became her supervisor in July 2003:

- In July 2003, when Mr. Breheny arrived, Complainant was working full-time with an altered schedule of 7:00 a.m. to 3:30 p.m.

RESPONSE:  Admitted.

- On September 23, 2003, Complainant requested, for childcare reasons, a part-time schedule of 32 hours (or four days) per week.

5

RESPONSE:  Admitted.

- On October 6, 2003, Mr. Breheny granted Complainant's request to work part-time, provided her hours were changed to 8:00 a.m. – 4:30 p.m.  When Complainant said that the traffic after 4:00 p.m. made it difficult to meet her childcare responsibilities, Mr. Breheny compromised and permitted Complainant to work a part-time schedule with hours of 7:30 a.m. to 4:00 p.m.

RESPONSE:  Admitted.  Complainant based her request on the requirement that she be home by

4 p.m. to eliminate the need to place her younger child in an after school program, because the

after-school program was causing stress for her daughter.

- In early December 2003, Complainant requested to reduce her hours to 24 hours per week so she could teach a class at Georgetown University Law Center in the middle of the work day.  On December 20, 2003, Mr. Breheny agreed to allow Complainant to work 24 hours per week, but required that she work the 24 hours on Monday, Wednesday and Friday, rather than spread her part-time hours over five days.

RESPONSE:  Admitted that in December 2003 the Complainant again requested a

schedule change, this time to allow her to work a part time schedule of three full days and two

half days of memo, but denied that she made the request to reduce her hours  solely because of

her teaching responsibilities; the request was also for childcare reasons.  Complainant has

maintained a 24-hour per week schedule during times that she was not teaching the course.

Complainant is not paid for hours that she is not scheduled to work for the Commission; what

she does during those hours is not relevant to this proceeding.  The reason for the request, to

spread the hours over five days, was to allow Complainant to be at home with her children

during their after-school hours, which begin at 3 pm on most weekdays, while still working more

hours than her present schedule.  Also, Mr. Breheny was angry at the Complainant request to

change her schedule.  He asserted that she had committed to teach a class at Georgetown

University during Commission core hours "without permission," although she had informed Ms.

Osheroff about the course in June 2003 and Ms. Osheroff had verbally approved her taking the

6

time to teach. Admitted that he insisted that she work 24 hours, rather than her proposed 32, and

that she be in the office Mondays, Wednesdays, and Fridays from 7:30 a.m. until 4:00 p.m. See

ROI, Tab F-1, Tr. 15.

- On July 9, 2004, Complainant requested to return to a full-time schedule, and to change
  her hours to 7:00 a.m. to 3:30 p.m., so that she could meet her daughter, who
  Complainant said was having emotional problems, at the school bus each day. Mr.
  Breheny granted her request to return to a full-time schedule, but denied her request to
  change her hours to 7:00 to 3:30. Ms. Griffith then filed a grievance under the Collective
  Bargaining Agreement ("CBA") between the Agency and the National Treasury
  Employees' Union regarding Mr. Breheny's denial of her request to change her schedule.
  That grievance was denied.

RESPONSE:  Complainant admits that in July or August 2004, in anticipation of

difficulties in balancing work and family with two children in demanding school programs in the

fall, she requested that the Agency return her hours to 7:00 to 4:30. Compl. Int. Ans., No. 13, p.

17. Mr. Breheny denied her request. Id. He said, "It's too important to this office for me to

agree to this." The Complainant replied, "I'm sorry, but this is very important to my family, and

I am going to have to fight you on this." He said, "Bring it on."

On August 13, 2004, the Complainant filed a step one grievance over Mr. Breheny's

denial of her schedule change. Compl. Int. Ans., No. 12, p. 12. She continued grieving the issue

through November 2004, when the SEC denied it. Id., No. 13, p. 12.

RESPONSE:  Admitted.

- In November 2005, Ms. Griffith returned to work at her current schedule of 24 hours per
  week, 7:30 to 4:00, Monday, Wednesday, and Friday

RESPONSE:  Admitted.

- In January 2005, Complainant requested to return to a part-time schedule "partly to allow
  [her] to teach a corporate transactions class to third-year law students at Georgetown . . .
  and partly to permit me to address my daughter's needs better." Her request was granted.

7

In May 2005, Ms. Griffith requested a six-month leave of absence so that she could take

care of her daughter, who Ms. Griffith said was having serious emotional problems.

RESPONSE:  Admitted.

- May 2005, Ms. Griffith requested a six-month leave of absence so that she could take

  care of her daughter, who Ms. Griffith said was having serious emotional problems.

RESPONSE:  Admitted.

- In November 2005, Ms. Griffith returned to work at her current schedule of 24 hours per

  week, 7:30 to 4:00, Monday, Wednesday, and Friday.

19.  Ms. Griffith's work in OMA is "reviewed", which means that she submits her
comment letters to one of the other staff attorneys assigned to review her work, so that they can
read it and comment on it before it is sent outside the Commission.

RESPONSE:  Admitted.

20.  The general practice in OMA is to have other staff attorneys review an attorney's
work for about a year after they join the office.  Generally, the purpose of reviewing an
attorney's work is to make sure that it meets office requirements before it is sent outside the
Commission.  The review process is the same for all new attorneys in the office.  After attorneys
have been in the office for a year, their work is evaluated to determine whether it still needs to be
reviewed in whole or in part.

RESPONSE:  Admitted.

21.  At the time of the Agency's EEO Office's investigation of the complaint, since Mr.
Breheny began supervising OMA in July 2003, in addition to Complainant, Mr. Pressman (under
40, no children) and Ms. Murphy (a mother under 40), had had their work reviewed by other
staff attorneys because they joined the office as new attorneys.

RESPONSE:  Admitted.

22.  Not all OMA attorneys are ready to go without review after one year in the office.

RESPONSE:  The Complainant has no evidence relevant to this statement, since the Agency has

provided no evidence to substantiate it.

23.  Mr. Pressman still has some of his work reviewed, even though he joined OMA in
August 2004.

8

RESPONSE: Complainant has no basis for knowing this.

24. Ms. Murphy's work was reviewed for about 13 months.

RESPONSE: Complainant has no basis for knowing this.

25. Mr. Breheny does not require any of the mothers in the office, other than Complainant, to have her work reviewed by other staff attorneys.

RESPONSE: Admitted

26. Ms. Griffith's work has been subject to review intermittently since she joined OMA in 1999.

RESPONSE: Admitted, and Complainant points out the following:

The review has never been explained or justified. See ROI, Tab F-1, p. 14; Compl. Int.

Ans., p. 15. The peer review was not sanctioned by any SEC or Division rules, see Osheroff

Depo. 81; ROI, Tab F-1, Tr. 14, and it was unprecedented. No other attorney in the office who

had passed the initial "probationary" or "trial" period had ever been subjected to such a peer

review. See Osheroff Depo. 89-90, 110. Mr. Garris did not believe that all of the Complainant's

work should be reviewed or subject it to peer review all the time. See Osheroff Depo. 16, 102;

ROI, Tab F-1A, p. 11. While Mr. Garris was on extended leave in 2002, Ms. Osheroff never

reviewed any of the Complainant's filings, even when Ms. Griffith specifically asked her to look

at some of them. Also, during the time Mr. Garris was gone, some of her filings were reviewed

Ms. Carmody and Mr. Panos, but most were not. The peer review system not only added an

unnecessary layer of review on the Complainant's work; it also gave her peers the incentive to

find fault with her work. ROI, Tab F-1, Tr. 25. No one, including outside counsel, SEC staff

members, or the investing public, ever complained about Complainant's work either, during this

period or after Mr. Breheny joined OMA. See Breheny Depo. 266 (he could not identify any

9

specific complaint). For a couple of months, in the early spring of 2003, no one reviewed the

Complainant's work. See ROI, Tab F-1a, p. 3.

27. Ms. Griffith's previous supervisor, Mr. Garris, sometimes required Complainant's
work to be reviewed.

RESPONSE: Admitted, but for long periods of time Mr. Garris did not require her work to be

reviewed by peers. See ROI, Tab F-1A, p. 11; Osheroff Depo 16, 102.

28. Mr. Garris told Complainant that her work was being reviewed because he had
concerns about her legal judgment. Mr. Garris's evaluations of Complainant all stated that she
needed to improve her understanding of mergers and acquisitions law.

RESPONSE: Admitted that the statement is a fair paraphrase of the evaluation, but the

document in its entirety speaks for itself and just because the document says that does not mean

it is a correct appraisal of the Complainant's work, and indeed it is not. See ROI, Tab F-1, Tr.

27-30; ROI, Tab F-1A, pp. 1-9.

29. Complainant's 2002 and 2003 performance evaluations by Mr. Garris referred to the
need to review her work. For example, the 2003 evaluation said: Most of Ms. Griffith's work is
reviewed, especially work related to complex matters. Ms. Griffith needs to give greater
attention to detail and accuracy of her work so that she will be able to work with less
supervision. From time to time Ms. Griffith's work is not reviewed primarily because of the
shortage of resources in the office. When her work is not reviewed she seems to fall behind in
her assignments and does not keep pace with the issues. Although she will improve as her work
is then reviewed, she seems to fall behind and not deal adequately with the issues when left to
her own accord.

RESPONSE: Admitted that the statement is a fair paraphrase of the evaluation, but the

document in its entirety speaks for itself and just because the document says that does not mean

it is a correct appraisal of the Complainant's work, and indeed it is not. ROI, Tab F-1A, pp. 1-9.

Complainant denies that the appraisal was a fair evaluation of Complainant's work, as

evidenced by the facts that Mr. Garris--

- was unable to cite any reasons other than timeliness for the review of Complainant's

work;

10

- cited no examples to support his claims of inaccuracy or lack of attention to detail;

- admitted that there was a shortage of resources in the office; and

- admitted that the shortage of resources in the office made review of an experienced

attorney's work impracticable.

Merely documenting that Mr. Garris was uneasy with Ms. Griffith does not prove that Mr. Garris

correctly appraised the Complainant's work. Actually, it shows that Mr. Garris's limited

knowledge of the Complainant's work and his obvious distaste for the Complainant led him to

make an inaccurate appraisal of her work. If Mr. Garris had examples to support his claims,

wouldn't he have cited them? He did not. See ROI, Tab F-1, Tr. 27-30; Tab F-1A, pp. 1-9;

Osheroff Depo. 61, 102.

Complainant also denies Mr. Garris's assertion that she required review when she was

addressing complex matters. Since the beginning of her tenure at the SEC in 1996, Complainant

has been assigned to some of the most complex work the Commission staff performs and before

Mr. Garris, she was favorably evaluated on work of that nature by all of her supervisors. See

"highly complex" designation on performance management records, ROI, Tab F-24, pp. 24, 32.

Indeed, even Mr. Garris rated her acceptable on such work in his own evaluations.

30. All of Complainant's evaluations between 1999 and 2003 noted that Complainant had

trouble completing work in a timely manner. For example, her 2003 evaluation said:

> Ms. Griffith needs to work on her productivity by completing her review of transactions
> in a timely manner without sacrificing quality in order to meet deadlines. Timeliness is
> essential to the work of the office due to its importance in M&A transactions. Ms.
> Griffith continues to struggle in this area. Ms. Griffith needs to inform her supervisor of
> timing issues in her workload before they become a problem. She needs to be candid
> with her supervisor concerning the timing of her workload and the resolution of issues.
> She needs to concentrate her efforts in this area, as she has been advised of this since
> joining the office.

11

RESPONSE:  Admitted that the statement is a correct quotation from the evaluation, but the

document in its entirety speaks for itself and just because the document says that does not mean

it is a correct appraisal of the Complainant's work, and indeed it is not.  Osheroff Depo. 61, 102.

Also, Complainant denies that any lack of timeliness on her part ever had any negative impact on

investors. By Mr. Garris's own admission, see No. 29, supra, there was a shortage of resources

in the office at this time, which may have caused problems with timeliness for a mother who was

unable to work additional hours to complete her filings.

Respondent has produced no evidence that Complainant was materially less timely than

other attorneys in OMA during the same period.  Nor has Respondent has produced any evidence

to show that Complainant's workload was appropriate to her part time assignment, or even that it

was commensurate with that of other OMA attorneys.  Absent supporting evidence, Respondent

may not baldly assert that any lapse in timeliness by the Complainant immediately necessitated

review of her work. Mr. Garris's and Mr. Breheny's actions, in assigning filings and

determining Complainant's workload, had a material impact on her ability to complete filings in

a timely manner.

31. When Mr. Breheny began supervising OMA in July 2003, at least some of
Complainant's work already was being reviewed.

RESPONSE:  Admitted that at that time in July 2003, some of Complainant's work was being

reviewed and some was not.  For example, she was sending out Schedule 14F-1's and some

Schedule TO-I's without review.  ROI, Tab F-1A, p. 3.  This shows not only inconsistency by

the Agency in claiming that the Complainant's work needed to be reviewed; it also demonstrates

that before Mr. Breheny started reviewing her work hypercritically, the Agency did not see the

need to review all of the Complainant's work at that time.  Id.

12

32. Mr. Breheny decided that either he, Ms. Carmody, Ms. Chalk or Mr. Panos would review Complainant's work.

RESPONSE:  Complainant has no basis to determine what Mr. Breheny "decided"; she can

merely attend to his actions. Complainant admits that the named reviewed her work.

33. Mr. Breheny has said that he required, and continues to require, Complainant's work to be reviewed because she misses legal issues in filings, communicates poorly, and misses deadlines.

RESPONSE:  Admitted that Mr. Breheny has made that assertion, but denied that his

assessments (that Complainant's work needs to be reviewed and that she misses legal issues in

filings, communicates poorly, and misses deadlines) are correct.

34. Mr. Breheny has said that the practice of reviewing Complainant's work is based on her performance, and that her work "is not up to par, and therefore, as a supervisor in the office, I need to have her work reviewed to make sure that I feel comfortable with what's going out." .

RESPONSE:  Admitted that Mr. Breheny has made that assertion, but denied that his

assessments are correct. Denied that his assessments are correct. Again Respondent has offered

no evidence to support it assertion about her work. Complainant submits that nine years of

satisfactory performance evaluations, ROI, Tab F-24; a Capital Markets Award, ROI, Tab F-24,

pp. 76-76, 101, promotion to Special Counsel within eighteen months of joining the agency, Tab

F-25, p. 50; a letter of thanks and commendation from the Division Director, appointment as an

adjunct member of the law faculty of Georgetown University, appointment to the board of the

SEC Child Development Center, and appointment by the board as Legal Coordinator, and a

recent Community Service Award from the Chairman's office all show that she is an outstanding

attorney and is not someone whose work "is not up to par."

35. In his response to her August 2004 grievance regarding her work schedule, Mr. Breheny told Complainant that her work was being reviewed because she had not consistently met certain office requirements. In the same memorandum, Mr. Breheny gave Complainant seven specific examples of deficiencies in her work in 2004 alone.

RESPONSE: Admitted that Mr. Breheny has made those assertions, but denied that his

assessments are correct and states that the document speaks for itself. In fact, the standard for

satisfactory performance on every one of her performance elements was "few exceptions," ROI,

Tab F1A, pp. 305, and the Agency's submission shows that the Complainant's so-called

"deficiencies were actually "few" in number. Mr. Breheny has not shown that Complainant

failed to meet the applicable standard or deserved the rating of "unacceptable". See ROI, Tab F-

1A, pp. 4-5.

36. On May 13, 2005, Mr. Breheny rated Complainant's performance for the rating year
of May 1, 2004 to April 30, 2005 as "unacceptable" in the categories of Communications and
Planning and Organizing Work. She also received an overall performance rating of
"unacceptable" for that rating year.

RESPONSE: Admitted that the statement is a correct quotation from the evaluation, but the

document in its entirety speaks for itself and just because the document says that does not mean

it is a correct appraisal of the Complainant's work, and indeed it is not. See ROI, Tabs F-1, F-

1A.

37. In the Agency's system of annual performance evaluation, non-supervisory
employees are rated either "acceptable" or "unacceptable" in four performance categories:
Planning and Organizing Work; Execution of Duties; Knowledge of Field; and Communications.
If an employee is rated "unacceptable" in any of these four performance categories, their overall
performance will be rated unacceptable.

RESPONSE: Admitted.

38. Mr. Breheny has said that he rated Complainant unacceptable because: (1) her work
was not clear, concise, well-organized or accurate; (2) she was not responsive to the needs and
questions of people inside the office or outside the Commission; and (3) she failed to keep Mr.
Breheny informed of problems in connection with her filings (e.g., she failed to let Mr. Breheny
know when she couldn't get her work done on time).

RESPONSE: Admitted that Mr. Breheny has made those assertions, but denied that his

assessments are correct and states that the document speaks for itself.

14

39. Mr. Breheny also has said that he had received complaints about Complainant from the outside bar.

RESPONSE:    Admitted that Mr. Breheny has made those assertions, but denied that his

assertions are correct. Complainant further denies that Mr. Breheny has ever made Complainant

aware of any such complaints or asked Complainant to explain or refute any outside complaint.

Complainant submits that complaints against members of the staffs of regulatory agencies are

not unusual, but that she has not been made aware of <u>any</u> complaints against her. Absent

information concerning the nature and timing of the alleged complaints, it is not possible for

Complainant to respond to Mr. Breheny's assertion.

40. When Mr. Breheny met with Complainant to give her the 2005 evaluation, he provided her with a "List of Identified Problems" that contained twelve specific examples of deficiencies that he had identified in her work over the rating period.

RESPONSE:    Admitted that Mr. Breheny has made those assertions, but denied that his

assertions are correct and reminds the Commission that the applicable performance standard for

an acceptable rating has been "few exceptions." See above, No. 35.

41. Two days after receiving her unacceptable performance evaluation, Complainant went on her 6-month leave of absence.

RESPONSE:    Admitted, but Complainant objects to the insinuation that she took the leave

because of the evaluation, for in fact she requested the leave a week or two before she received

the evaluation, and the Agency acknowledges that "in May 2005, Ms. Griffith requested a six-

month leave of absence so that she could take care of her daughter, who Ms. Griffith said was

having serious emotional problems." (See Response to No. 13 above).

42. Complainant is the only employee in OMA whom Mr. Breheny has rated unacceptable on a performance evaluation.

RESPONSE:    Admitted.

15

43. On November 28, 2005, Mr. Breheny placed Com plainant on a PIP. On that day, Mr. Breheny provided Complainant with a memorandum entitled "Notice of Opportunity to Improve Performance", which stated the reasons why he had rated Complainant's performance unacceptable, and described what she had to do to improve he performance.

RESPONSE: Admitted that Mr. Breheny has made those assertions, but denied that his

assertions are correct.

44. The PIP memorandum also informed Complainant that she had 120 days to raise her performance to an acceptable level, and that if she did not do so, the Agency could initiate remedial action (such as removal or reduction in grade).

RESPONSE: Admitted.

45. The PIP memorandum also informed Complainant that she had to sustain acceptable performance for one year, and that if she did not, she could be removed or demoted without being given an additional opportunity to demonstrate acceptable performance.

RESPONSE: Admitted.

46. Mr. Breheny has said that the purpose of the PIP was to get Complainant to improve her work to an acceptable level.

RESPONSE: Admitted that Mr. Breheny has made that assertion, but denied that his assertion

was correct. In fact, the evidence shows that his purpose was to begin forcing Complainant to

leave the Agency, for discriminatory reasons.

47. Complainant is the only employee in OMA whom Mr. Breheny has placed on a PIP.

RESPONSE: Admitted.

48. If an employee is rated unacceptable on their annual performance evaluation, Commission procedure and the Collective Bargaining Agreement between the Agency and the National Treasury Employees Union (CBA) require that the employee be placed on a PIP.

RESPONSE: Admitted.

49. During the PIP period, Mr. Breheny found that Complainant's work performance improved to an acceptable level.

RESPONSE: Admitted.

50. Complainant has not been removed, demoted or placed on another PIP.

16

RESPONSE:  Admitted.

51. Mark Green is not a Special Counsel in OMA, and has a different supervisor than Complainant.

RESPONSE:  Admitted.  It should also be noted that Mr. Green has a higher position than does

the Complainant; that Mr. Green is supervised directly by Ms. Osheroff, who is also Mr.

Breheny's direct supervisor; and that because Mr. Green's office is on the same hallway and

between Mr. Breheny's office and Ms. Osheroff's office, Complainant believes that Mr. Breheny

is aware of Mr. Green's altered work schedule.

52. Mr. Breheny never said anything to Complainant about her age or gender.

RESPONSE:  Denied.  Complainant submits that neither party is in a position to assert that they

"never" said "anything about her age or gender" in a three-year period.  Also, even if this

assertion were amenable to proof, which it is not, it is not dispositive of Complainant's age and

gender discrimination claims.

53. Other than Complainant, not a single one of the Special Counsels who are mothers received an unacceptable performance evaluation, was placed on a PIP, or had her work reviewed by other staff attorneys significantly beyond the standard one-year period.

RESPONSE:  Admitted.

54. Since Mr. Breheny began supervising OMA, Mr. Pressman, a male with no children, has been the only person, other than Complainant, who has had his work reviewed more than 13 months past his first year in the office.

RESPONSE:  Admitted insofar that as of the time of Mr. Breheny's deposition, Mr. Pressman

may have been the only attorney whose work was reviewed by peers after his first 13 months in

the office.  However, it is Complainant's understanding that both Mr. Duchovny and Mr.

Heyliger are still having their work reviewed, perhaps as a result of her allegations in this case.

55. In 2005 (the year Complainant received an unacceptable performance evaluation and no merit step increase) the other female Special Counsels with children received either two or

May 03 07 05:38p       Banov,Bremis,Byndloss      (202) 842-9331          P.13
Case 1:07-cv-01745-JDB    Document 9-2    Filed 01/02/2008    Page 18 of 21

15

RESPONSE:   Admitted that Mr. Breheny has made those assertions, but denied that his

assertions are correct.

44. The PIP memorandum also informed Complainant that she had 120 days to raise her performance to an acceptable level, and that if she did not do so, the Agency could initiate remedial action (such as removal or reduction in grade).

RESPONSE:   Admitted.

45. The PIP memorandum also informed Complainant that she had to sustain acceptable performance for one year, and that if she did not, she could be removed or demoted without being given an additional opportunity to demonstrate acceptable performance.

RESPONSE:   Admitted.

46. Mr. Breheny has said that the purpose of the PIP was to get Complainant to improve her work to an acceptable level.

RESPONSE:   Admitted that Mr. Breheny has made that assertion, but denied that his assertion

was correct.  In fact, the evidence shows that his purpose was to begin forcing Complainant to

leave the Agency, for discriminatory reasons.

47. Complainant is the only employee in OMA whom Mr. Breheny has placed on a PIP.

RESPONSE:   Admitted.

48. If an employee is rated unacceptable on their annual performance evaluation, Commission procedure and the Collective Bargaining Agreement between the Agency and the National Treasury Employees Union (CBA) require that the employee be placed on a PIP.

RESPONSE:   Admitted.

49. During the PIP period, Mr. Breheny found that Complainant's work performance improved to an acceptable level.

RESPONSE:   Admitted.

50. Complainant has not been removed, demoted or placed on another PIP.

RESPONSE:   Admitted.

16

51. Mark Green is not a Special Counsel in OMA, and has a different supervisor than Complainant.

RESPONSE: Admitted. It should also be noted that Mr. Green has a higher position than does

the Complainant; that Mr. Green is supervised directly by Ms. Osheroff, who is also Mr.

Breheny's direct supervisor; and that because Mr. Green's office is on the same hallway and

between Mr. Breheny's office and Ms. Osheroff's office, Complainant believes that Mr. Breheny

is aware of Mr. Green's altered work schedule.

52. Mr. Breheny never said anything to Complainant about her age or gender.

RESPONSE: Denied. Complainant submits that neither party is in a position to assert that they

"never" said "anything about her age or gender" in a three-year period. Also, even if this

assertion were amenable to proof, which it is not, it is not dispositive of Complainant's age and

gender discrimination claims.

53. Other than Complainant, not a single one of the Special Counsels who are mothers received an unacceptable performance evaluation, was placed on a PIP, or had her work reviewed by other staff attorneys significantly beyond the standard one-year period.

RESPONSE: Admitted.

54. Since Mr. Breheny began supervising OMA, Mr. Pressman, a male with no children, has been the only person, other than Complainant, who has had his work reviewed more than 13 months past his first year in the office.

RESPONSE: Admitted insofar that as of the time of Mr. Breheny's deposition, Mr. Pressman

may have been the only attorney whose work was reviewed by peers after his first 13 months in

the office. However, it is Complainant's understanding that both Mr. Duchovny and Mr.

Heyliger are still having their work reviewed, perhaps as a result of her allegations in this case.

55. In 2005 (the year Complainant received an unacceptable performance evaluation and no merit step increase) the other female Special Counsels with children received either two or three merit step increases, while the lowest step increase, other than Complainant's, was received by Mr. Pressman.

17

three merit step increases, while the lowest step increase, othe than Complainant's, was received by Mr. Pressman.

RESPONSE: Admitted that this is probably true, but there is no reason that the Complainant

would know whether it is true.

56. Complainant's PIP was not placed in her official personnel folder.

RESPONSE: Complainant does not know if this is true or fa se.

57. Article 36 of the CBA says that the Agency must place an employee on a PIP "before taking an action based on unacceptable performance."

RESPONSE: Admitted

58. All lawyers in OMA go through the process of having their work reviewed, at least for the first year that they work in the office, and sometimes for longer.

RESPONSE: Denied. Only Complainant and lawyers who have joined the office since Mr.

Breheny took it over have been reviewed for an extended per od. When Mr. Garris was the head

of OMA, a typical review period was three months. Complainant's initial review period was

three months, followed by a period of as much as two years when her work was not reviewed.

59. The handwritten notes on the comment letters are at Exhibit 1 to ROI Tab F-1A are Complainant's.

RESPONSE: Admitted.

## VERIFICATION

I hereby verify under penalty of perjury that the foregoing responses are correct to the

best of my knowledge, information, and belief.

Executed at _____, on May 4, 2007.

_____
JULIE GRIFFITH

18

Respectfully submitted,

ALAN BANOV
Alan Banov and Associates
1819 L Street, N.W.
Suite 700
Washington, D.C. 20036
(202) 822-9699
Fax: 202-842-9331
Attorney for Complainant

# EXHIBIT
# 2

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Washington Field Office
1801 L Street, N.W., Suite 100
Washington, D.C. 20507

To:    **Alan Banov**
**Banov & Associates**
1819 L Street, NW, Ste. 700
W DC 20036
2-822-9699
2-822-9331 FAX

Re: <u>Julia E. Griffith v. SEC-EEOC No. 570-2006-00464X; Agency No. SEC 20-05-05.</u>

The attached submission from  X Complainant   Agency, received in this office on May 03 , 2007, is rejected and returned to its sender, because it is deficient in the area(s) indicated:

☐    The submission was not filed by the designated representative; or was not signed.

☐    The party filing the submission did not certify that he/she served it on the opposing party and/or the certificate of service either does not indicate the date of mailing or personal service or does not list the name/address of person(s) served.

✓    The submission and/or response is <u>not timely filed</u>, without a prior request for leave to file out of time, and there is no showing of good cause for untimeliness.

☐    The material submitted is not legible. The submission exceeds page limitations set in prior Order(s), and party has not requested and obtained leave to exceed the page limitations.

☐    The submission is a multiple pleading (e.g., reply, sur-reply, to pleading) that has not been authorized.

☐    Discovery requests and responses to such requests are not to be filed with the Administrative Judge except as attachments to a motion to compel. Evidence obtained through discovery may be submitted at the hearing or with a dispositive motion/response to such motion.

☐    The party filing a motion to compel did not certify that he or she attempted to confer and resolve the discovery dispute with the opposing party, within five days from opposing party's expiration date for responding to the discovery request. A simple request regarding the status of any overdue response is not sufficient to establish that the parties have conferred in an attempt to resolve a dispute.  The parties shall hold a face to face meeting for one hour in an attempt to resolve any discovery disputes.  If the parties' geographic location preclude them from having a face to face meeting, the meeting should be conducted telephonically.

☐    **The motion to compel does not include as attachments the discovery requests and responses in dispute.**

☐    **The submission is a multiple copy. When filing papers with this office, the parties shall transmit one copy of such papers by facsimile, mail, or hand delivery.**

☐    **Other:**

Varice Ted Henry
Administrative Judge

Attachment

cc: (form only)

# EXHIBIT
# 3

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Washington Field Office

| | |
|---|---|
| Julia Griffith, | : |
| Complainant, | : |
| v. | : |
| Christopher Cox, | : |
| Chairman, | : |
| Securities and Exchange Commission, | : |
| Agency. | : |

EEOC No. 570-2006-00464X
Agency No. 20-05-05
Judge Varice Henry

February 14, 2007

## <u>DECLARATION OF JEANINE LAUTH</u>

1.  My name is Jeanine Lauth. I am Chief of the Program Administration Branch in the Division of Corporation Finance (the "Division") at the Securities and Exchange Commission. My duties include assisting the Director of the Division and other Division managers with administrative aspects of employee/management relations and human resources. In this position, I have access to a variety of employee records.

2.  As of September 27, 2005, the Special Counsels who worked in the Office of Mergers and Acquisitions (OMA) were Abby Adams, Pamela Carmody, Christina Chalk, Julia Griffith, Celeste Murphy, Nicholas Panos, Michael Pressman and Mara Ransom.

3.  Daniel Duchovny became a Special Counsel in OMA on March 19, 2006.

4.  At all times from September 27, 2005 to the present, Christina Chalk, Pamela Carmody and Celeste Murphy all worked either part-time, on an altered work schedule, or both. At that time, Ms. Chalk worked 7:30 a.m. to 4:00 p.m. on Monday, Tuesday and Thursday; Ms. Carmody worked 9:00 a.m. to 5:30 p.m., Monday, Tuesday, Wednesday, and Friday; and Ms.

Murphy worked 8:00 a.m. to 4:30 p.m. Monday through Friday.

5.    All of the permanent employees in OMA, other than Brian Breheny, Adelaja

Heyliger and Mr. Duchovny, currently work either part-time or on an altered work schedule.

6.    Since November 15, 2005, when Julia Griffith returned to work after a leave of

absence, her schedule has been 24 hours per week, 7:30 a.m. to 4:00 p.m., Monday, Wednesday,

and Friday.

7.    I have reviewed the Agency's answers to Complainant's Interrogatories, Nos. 13

and 16, and 19 (attached as Exhibit A), and verify that they are accurate, except that Pam

Carmody's schedule was changed, as of September 5, 2006 to 8:00 a.m. to 4:00 p.m., Monday,

Tuesday, Wednesday and Friday.

8.    I have reviewed Exhibit B to my declaration, and can verify that it is a copy of

Article 36 of the Collective Bargaining Agreement between the Agency and the National

Treasury Employees' Union.

9.    I have reviewed a copy of Julia Griffith's official personnel file and can verify that

it does not contain any record of the Performance Improvement Plan that she received in

November 2005.


I certify that the foregoing is true and correct to the best of my knowledge.


2/13/07
Date

Jeanine Lauth

# EXHIBIT
# 4



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON,  D.C. 20549**

OFFICE OF
EQUAL EMPLOYMENT
OPPORTUNITY

June 28, 2007

**Federal Express**

Alan Banov, Esq.
Alan Banov and Associates
1819  L Street, NW – Suite 700
Washington, DC 20036-3830

Re:    Julia E. Griffith v. Christopher Cox, Complaint No. 20-05-05;
          EEOC Case No. 570-2006-00464X

Dear Mr. Banov:

Enclosed is the U.S. Securities and Exchange Commission's Final Action Order in connection with the above referenced complaint.

If you have any questions, please contact the EEO Office, telephone number: (202) 551-6040.

Sincerely,

Deborah K. B         hi
EEO Director

Enclosures: Final Action Order
                    EEOC Form 573

cc:    Julia E. Griffith
        1702 Chesterford Way
        McLean, VA 22101 (with enclosures)

        Varice Ted Henry
        Administrative Judge
        EEOC (with enclosures)

        Laura Walker, Esq.
        Office of General Counsel (with enclosures)

Julia E. Griffith,                              : Agency Case No.:
            Complainant                         : 20-05-05
                                                :
                                                : EEOC Case No.:
            v.                                  : 570-2006-00464X
                                                :
Christopher Cox, Chairman,                      :
U.S. Securities and Exchange Commission,        :
            Agency                              :

---

## FINAL ACTION ORDER

By Order dated June 13, 2007, U.S. Equal Employment Opportunity Commission Administrative Judge Varice Ted Henry issued a decision in the above-referenced matter. Judge Henry concluded that the U. S. Securities and Exchange Commission (SEC) did not discriminate against Complainant on the bases of her gender or age when (a) between July 2003 and May 13, 2005, her supervisor insisted her work be reviewed by other staff attorneys before being sent outside the SEC; (b) it gave her an unacceptable performance rating for the 2004-2005 rating period; and (c) on November 30, 2005, it placed her on a Performance Improvement Plan.

Judge Henry found that Complainant failed to establish a *prima facie* case of discrimination because she "failed to establish that she was treated differently than similarly situated employees outside her protected class." Moreover, Judge Henry noted that the SEC proffered:

> [R]easonable and legitimate non-discriminatory reasons for its actions regarding the issues raised by Complainant, including, but not limited to: Complainant's work needed review because she failed to meet deadlines, keep people informed of her schedule, respond to requests for information, provide accurate or complete information in comment letters and/or understand office policies and procedures. These were ultimately the same reasons that Complainant received an "unacceptable" performance rating and was therefore place on a PIP.

Judge Henry further found that Complainant "failed to set forth adequate material evidentiary facts that support her allegations of discrimination" and "presented no direct evidence of discriminatory animus in support of her allegations."

Based on the above, the SEC hereby adopts and will fully implement the decision rendered by Judge Henry.

## RIGHTS OF APPEAL

### I.    Right to Appeal the SEC's Final Action Order to EEOC

If you disagree with the SEC's Final Action Order, you may file a notice of appeal with the Equal Employment Opportunity Commission (EEOC) within 30 days following your receipt of the order.[1]  The appeal must be filed using EEOC Form 573, a copy of which is enclosed.  Filing with the EEOC may be done by mail, personal delivery or by facsimile and should indicate which issues you seek to appeal.  You may attach a statement along with any other documents in support of your appeal, or you may submit such statement and documents within 30 days of filing your appeal.  The original of the appeal and any statement and documents in support should be filed with the EEOC in one of the following ways:

(1) By Mail addressed to:

> Director, Office of Federal Operations
> U.S. Equal Employment Opportunity Commission
> P.O. Box 19848
> Washington, D.C. 20036

(2) By Hand-Delivery addressed to:

> Director, Office of Federal Operations
> U.S. Equal Employment Opportunity Commission
> 1801 L Street, N.W., 5th Floor
> Washington, D.C. 20507

(3) By Facsimile sent to: (202) 663-7022

At the same time you file your notice of appeal with the EEOC, a copy of the appeal and any statement or documents in support of the appeal also must be sent to the SEC EEO Director at the following address:

> Deborah K. Balducchi, Director
> Office of Equal Employment Opportunity
> U.S. Securities and Exchange Commission
> 100 F Street, NE
> Washington, DC 20549-0212

---

[1] If you are represented by an attorney, the 30-day time period begins to run on the date your attorney receives this notice.

You must certify in your notice of appeal to the EEOC the date and method by which you served the SEC EEO Director. Failure to file within the time limits discussed above may result in the EEOC's dismissal of your appeal as untimely.

## II.    Right to File a Civil Action

In addition to your right to appeal to the EEOC, you have the right to file a civil action in U.S. District Court with respect to the SEC's Final Action Order. You may file a civil action under the following circumstances:

(1)    instead of appealing the SEC's Final Action Order to the EEOC, you may file a civil action within 90 days after receiving the SEC order; or

(2)    if you choose to file an appeal with the EEOC, you still have the right to file a civil action within 90 days after receiving the EEOC's final decision on your appeal; or

(3)    if the EEOC has not issued a final decision on your appeal within 180 days, you may elect to terminate EEOC's processing of your appeal and file a civil action.

Your civil action must name Christopher Cox, Chairman of the U.S. Securities and Exchange Commission, as the defendant using his full name and official title.  Failure to provide the name and official title of the agency head may result in a dismissal of your case.

If you file a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, or the Rehabilitation Act of 1973, as amended, 29 U.S.C. §792 et seq., and you do not have, or are unable to afford the services of a lawyer, you may request that the Court appoint a lawyer to represent you and that the Court permit you to file the action without payment of fees, costs, or other security.  Any such request must be made in the form or manner required by the Court, and the grant or denial of the request is within the sole discretion of the Court.  Moreover, filing a request for an attorney does not extend the time in which to file a civil action.

On behalf of the U.S. Securities and Exchange Commission,

Deborah K. Balducchi
Director
Office of Equal Employment Opportunity


_____ 6/20/07
Date

# EXHIBIT
# 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JULIA GRIFFITH, )<br><br>Plaintiff, )<br><br>v. )<br><br>CHRISTOPHER COX, Chairman, )<br>U.S. Securities and Exchange Commission, )<br><br>Defendant. ) | Civil Case No. 07-1745 (JDB) |

## DECLARATION OF FRAN PAVER

1.      My name is Fran Paver.  I am an attorney in the Office of Equal Employment

Opportunity ("EEO") at the United States Securities and Exchange Commission ("SEC").

2.      On or about June 28, 2007, I drafted a letter and Final Action Order (collectively,

"FAO") in the matter of *Griffith v. Cox*, Complaint No. 20-05-05, EEOC Case No. 570-2006-

00464X.

3.      On June 28, 2007, I presented the draft FAO to Ms. Deborah K. Balducchi for her

review and signature.

4.      On June 28, 2007, after Ms. Balducchi signed the FAO, I gave the signed FAO to

my assistant, Johnny Brooks, and directed him to send copies of the FAO to, among others, Alan

Banov, Esq. and Julia E. Griffith by Federal Express.  A copy of the signed FAO is attached

hereto as Exhibit A.

5.      Shortly thereafter, Mr. Brooks presented me with copies of air bills addressed to

Mr. Banov and Ms. Griffith, reflecting that copies of the FAO were sent to Mr. Banov and Ms.

Griffith by FedEx Priority Overnight delivery on June 28, 2007. Copies of such air bills are attached hereto as Exhibits B and C, respectively.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

1-2-08
_____
Date

_____
Fran Paver

# EXHIBIT
# A



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

OFFICE OF
EQUAL EMPLOYMENT
OPPORTUNITY

June 28, 2007

**Federal Express**

Alan Banov, Esq.
Alan Banov and Associates
1819 L Street, NW – Suite 700
Washington, DC 20036-3830

     Re:   <u>Julia E. Griffith v. Christopher Cox</u>, Complaint No. 20-05-05;
               EEOC Case No. 570-2006-00464X

Dear Mr. Banov:

    Enclosed is the U.S. Securities and Exchange Commission's Final Action Order in connection with the above referenced complaint.

    If you have any questions, please contact the EEO Office, telephone number: (202) 551-6040.

                             Sincerely,

                             Deborah K. Б     hi
                             EEO Director

Enclosures: Final Action Order
             EEOC Form 573

cc:    Julia E. Griffith
       1702 Chesterford Way
       McLean, VA 22101 (with enclosures)

       Varice Ted Henry
       Administrative Judge
       EEOC (with enclosures)

       Laura Walker, Esq.
       Office of General Counsel (with enclosures)

|  |  |  |
|---|---|---|
| **Julia E. Griffith,** | : | Agency Case No.: |
| **Complainant** | : | 20-05-05 |
|  | : |  |
|  | : | EEOC Case No.: |
| v. | : | 570-2006-00464X |
|  | : |  |
| **Christopher Cox, Chairman,** | : |  |
| **U.S. Securities and Exchange Commission,** | : |  |
| **Agency** | : |  |

---

### FINAL ACTION ORDER

By Order dated June 13, 2007, U.S. Equal Employment Opportunity Commission Administrative Judge Varice Ted Henry issued a decision in the above-referenced matter. Judge Henry concluded that the U. S. Securities and Exchange Commission (SEC) did not discriminate against Complainant on the bases of her gender or age when (a) between July 2003 and May 13, 2005, her supervisor insisted her work be reviewed by other staff attorneys before being sent outside the SEC; (b) it gave her an unacceptable performance rating for the 2004-2005 rating period; and (c) on November 30, 2005, it placed her on a Performance Improvement Plan.

Judge Henry found that Complainant failed to establish a *prima facie* case of discrimination because she "failed to establish that she was treated differently than similarly situated employees outside her protected class." Moreover, Judge Henry noted that the SEC proffered:

> [R]easonable and legitimate non-discriminatory reasons for its actions regarding the issues raised by Complainant, including, but not limited to: Complainant's work needed review because she failed to meet deadlines, keep people informed of her schedule, respond to requests for information, provide accurate or complete information in comment letters and/or understand office policies and procedures. These were ultimately the same reasons that Complainant received an "unacceptable" performance rating and was therefore place on a PIP.

Judge Henry further found that Complainant "failed to set forth adequate material evidentiary facts that support her allegations of discrimination" and "presented no direct evidence of discriminatory animus in support of her allegations."

Based on the above, the SEC hereby adopts and will fully implement the decision rendered by Judge Henry.

## RIGHTS OF APPEAL

### I.    Right to Appeal the SEC's Final Action Order to EEOC

If you disagree with the SEC's Final Action Order, you may file a notice of appeal with the Equal Employment Opportunity Commission (EEOC) within 30 days following your receipt of the order.[1] The appeal must be filed using EEOC Form 573, a copy of which is enclosed. Filing with the EEOC may be done by mail, personal delivery or by facsimile and should indicate which issues you seek to appeal. You may attach a statement along with any other documents in support of your appeal, or you may submit such statement and documents within 30 days of filing your appeal. The original of the appeal and any statement and documents in support should be filed with the EEOC in one of the following ways:

(1) By Mail addressed to:

> Director, Office of Federal Operations
> U.S. Equal Employment Opportunity Commission
> P.O. Box 19848
> Washington, D.C. 20036

(2) By Hand-Delivery addressed to:

> Director, Office of Federal Operations
> U.S. Equal Employment Opportunity Commission
> 1801 L Street, N.W., 5th Floor
> Washington, D.C. 20507

(3) By Facsimile sent to: (202) 663-7022

At the same time you file your notice of appeal with the EEOC, a copy of the appeal and any statement or documents in support of the appeal also must be sent to the SEC EEO Director at the following address:

> Deborah K. Balducchi, Director
> Office of Equal Employment Opportunity
> U.S. Securities and Exchange Commission
> 100 F Street, NE
> Washington, DC 20549-0212

---

[1] If you are represented by an attorney, the 30-day time period begins to run on the date your attorney receives this notice.

You must certify in your notice of appeal to the EEOC the date and method by which you served the SEC EEO Director. Failure to file within the time limits discussed above may result in the EEOC's dismissal of your appeal as untimely.

## II.    Right to File a Civil Action

In addition to your right to appeal to the EEOC, you have the right to file a civil action in U.S. District Court with respect to the SEC's Final Action Order. You may file a civil action under the following circumstances:

(1)    instead of appealing the SEC's Final Action Order to the EEOC, you may file a civil action within 90 days after receiving the SEC order; or

(2)    if you choose to file an appeal with the EEOC, you still have the right to file a civil action within 90 days after receiving the EEOC's final decision on your appeal; or

(3)    if the EEOC has not issued a final decision on your appeal within 180 days, you may elect to terminate EEOC's processing of your appeal and file a civil action.

Your civil action must name Christopher Cox, Chairman of the U.S. Securities and Exchange Commission, as the defendant using his full name and official title. Failure to provide the name and official title of the agency head may result in a dismissal of your case.

If you file a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, or the Rehabilitation Act of 1973, as amended, 29 U.S.C. §792 et seq., and you do not have, or are unable to afford the services of a lawyer, you may request that the Court appoint a lawyer to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. Any such request must be made in the form or manner required by the Court, and the grant or denial of the request is within the sole discretion of the Court. Moreover, filing a request for an attorney does not extend the time in which to file a civil action.

On behalf of the U.S. Securities and Exchange Commission,

_____
Deborah K. Balducchi
Director
Office of Equal Employment Opportunity

_____ 6/20/07
Date

# EXHIBIT B

**FedEx Express** — US Airbill

FedEx Tracking Number: **8618 9250 6031**

0215

**Sender's Copy**

**From** Please print and press hard.

Date **6/28/07**

Sender's FedEx Account Number **1309-8756-7**

Sender's Name **FRAN PAVER**    Phone **202 551-6040**

Company **SECURITIES & EXCHANGE COMM**

Address **100 F ST NE**

Dept./Floor/Suite/Room

City **WASHINGTON**    State **DC**    ZIP **20549-2001**

**Your Internal Billing Reference**
First 24 characters will appear on invoice.

**To**
Recipient's Name **ALAN BANOV, ESQ.**    Phone ( )

Company **ALAN BANOV AND ASSOCIATES**

Recipient's Address **1819 L STREET, NW**

We cannot deliver to P.O. boxes or P.O. ZIP codes.

**SUITE 700**

Dept./Floor/Suite/Room

Address
To request a package be held at a specific FedEx location, print FedEx address here.

City **WASHINGTON**    State **DC**    ZIP **20036**

0360741267

Schedule a pickup at fedex.com.
Simplify your shipping. Manage your account. Access all the tools you need.

**4a Express Package Service**    *Packages up to 150 lbs.*

[✓] FedEx Priority Overnight
Next business morning.* Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

[ ] FedEx Standard Overnight
Next business afternoon.* Saturday Delivery NOT available.

[ ] FedEx First Overnight
Earliest next business morning delivery to select locations.* Saturday Delivery NOT available.

[ ] FedEx 2Day
Second business day.* Thursday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

[ ] FedEx Express Saver
Third business day.* Saturday Delivery NOT available.

FedEx Envelope rate not available. Minimum charge: One-pound rate.

* To most locations.

**4b Express Freight Service**    *Packages over 150 lbs.*

[ ] FedEx 1Day Freight*
Next business day.* Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

[ ] FedEx 2Day Freight
Second business day.** Thursday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

[ ] FedEx 3Day Freight
Third business day.** Saturday Delivery NOT available.

* Call for Confirmation.

** To most locations.

**5 Packaging**

[✓] FedEx Envelope*

[ ] FedEx Pak*
Includes FedEx Small Pak, FedEx Large Pak, and FedEx Sturdy Pak.

[ ] FedEx Box

[ ] FedEx Tube

[ ] Other

* Declared value limit $500.

**6 Special Handling**    Include FedEx address in Section 3.

[ ] SATURDAY Delivery
NOT Available for FedEx Standard Overnight, FedEx First Overnight, FedEx Express Saver, or FedEx 3Day Freight.

[ ] HOLD Weekday
at FedEx Location
NOT Available for FedEx First Overnight.

[ ] HOLD Saturday
at FedEx Location
Available ONLY for FedEx Priority Overnight and FedEx 2Day to select locations.

Does this shipment contain dangerous goods?
One box must be checked.

[✓] No
[ ] Yes
As per attached Shipper's Declaration.
[ ] Yes
Shipper's Declaration not required.
[ ] Dry Ice
Dry Ice, 9, UN 1845 _____ kg

[ ] Cargo Aircraft Only

Dangerous goods (including dry ice) cannot be shipped in FedEx packaging.

**7 Payment**    Bill to:
Enter FedEx Acct. No. or Credit Card No. below.

[✓] Sender
Acct. No. in Section 1 will be billed.

[ ] Recipient    [ ] Third Party    [ ] Credit Card    [ ] Cash/Check

FedEx Acct. No.
Credit Card No.

Exp. Date

**Total Packages**    **Total Weight**    **Total Declared Value†**

$ _____ .00

† Our liability is limited to $100 unless you declare a higher value. See back for details. By using this Airbill you agree to the service conditions on the back of this Airbill and in the current FedEx Service Guide, including terms that limit our liability.

**8 Residential Delivery Signature Options**    If you require a signature, check Direct or Indirect.

[✓] No Signature Required
Package may be left without obtaining a signature for delivery.

[ ] Direct Signature
Someone at recipient's address may sign for delivery. Fee applies.

[ ] Indirect Signature
If no one is available at recipient's address, someone at a neighboring address may sign for delivery. Fee applies.

**519**

Rev. Date 10/06•Part #158279•©1994–2006 FedEx•PRINTED IN U.S.A.•SRS

# EXHIBIT C

**FedEx**
Express

**US Airbill**    FedEx Tracking Number  **8618 9250 6020**    **Sender's Copy**

Date 6/28/07    Sender's FedEx Account Number    1309-8756-7

Sender's name  FRAN PAVER    Phone ( 202 ) 551-6040

Company  SECURITIES & EXCHANGE COMM

Address  100 F ST NE

City  WASHINGTON    State  DC    ZIP  20549-2001

Your Internal Billing Reference    options
24 characters will appear on invoice.

Recipient's name  JULIA E. GRIFFITH    Phone ( )

Company

Recipient's address  1702 CHESTERFORD WAY
We cannot deliver to P.O. boxes or P.O. ZIP codes.    Dept./Floor/Suite/Room

Address
To request a package be held at a specific FedEx location, print FedEx address here.

City  McLEAN    State  VA    ZIP  22101

0360741267



**4a  Express Package Service**    *Packages up to 150 lbs.*
- [x] FedEx Priority Overnight
- [ ] FedEx Standard Overnight
- [ ] FedEx First Overnight
- [ ] FedEx 2Day
- [ ] FedEx Express Saver

**4b  Express Freight Service**    *Packages over 150 lbs.*
- [ ] FedEx 1Day Freight
- [ ] FedEx 2Day Freight
- [ ] FedEx 3Day Freight

**5  Packaging**
- [x] FedEx Envelope*
- [ ] FedEx Pak*
- [ ] FedEx Box
- [ ] FedEx Tube
- [ ] Other

**6  Special Handling**
- [ ] SATURDAY Delivery NOT Available for...
- [ ] HOLD Weekday at FedEx Location
- [ ] HOLD Saturday at FedEx Location

Does this shipment contain dangerous goods?
One box must be checked.
- [x] No
- [ ] Yes As per attached Shipper's Declaration
- [ ] Yes Shipper's Declaration not required.
- [ ] Dry Ice
- [ ] Cargo Aircraft Only

**7  Payment  Bill to:**
- [x] Sender
- [ ] Recipient
- [ ] Third Party
- [ ] Credit Card
- [ ] Cash/Check

Total Packages    Total Weight    Total Declared Value
$    .00

**8  Residential Delivery Signature Options**
- [x] No Signature Required
- [ ] Direct Signature
- [ ] Indirect Signature

519

Rev. Date 10/06•Part #158279©1994–2006 FedEx•PRINTED IN U.S.A.•SRS

**Find drop-off locations at fedex.com**
Simplify your shipping. Manage your account. Access all the tools you need.

# EXHIBIT
# 6



FedEx Express
Customer Support Trace
3875 Airways Boulevard
Module H, 4th Floor
Memphis, TN 38116

U.S. Mail: PO Box 727
Memphis, TN 38194-4643

Telephone: 901-369-3600

December 28,2007

Dear Customer:

The following is the proof of delivery you requested with the tracking number **861892506031**.

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivery location: | 1819  LST  NW  700 |
| Signed for by: | S.EPPS | Delivery date: | Jun 29, 2007 12:23 |
| Service type: | Priority Overnight | | |



---

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 861892506031 | Ship date: | Jun 28, 2007 |

**Recipient:**
AVAN BANOV ESQ
AVAN BANOVANO ASSOCIATES
1819 L ST NW STE 700

WASHINGTON, DC 20036 US

**Shipper:**
FRAN PAVER
SECURITIES & EXCHANGE COMM
100 F ST NE
WASHINGTON, DC 205492001 US

Thank you for choosing FedEx Express.

FedEx Worldwide Customer Service
1.800.GoFedEx 1.800.463.3339

Track Shipments/FedEx Kinko's Orders                          Quick Help
**Detailed Results**

| | | | |
|---|---|---|---|
| **Tracking number** | 861892506031 | **Destination** | WASHINGTON, DC |
| **Signed for by** | S.EPPS | **Service type** | Priority Overnight |
| **Ship date** | Jun 28, 2007 | | |
| **Delivery date** | Jun 29, 2007 12:23 PM | | |
| **Status** | Delivered | | |
| **Signature image available** | Yes | | |

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| **Jun 29, 2007** | 12:23 PM | **Delivered** | WASHINGTON, DC | |

Signature proof     Track more shipments/orders

E-mail your detailed tracking results (optional)

Enter your name and e-mail address, submit up to three e-mail addresses, add your message
(optional), and click **Submit**.  If you include a message, you must enter your name and e-mail address
in the fields provided.

**Your Name:**

**Your E-mail Address:**

**To E-mail Address(es):**

**Add personal message:**

Not available for non-English
characters

By selecting this check box and the Submit button, I agree to
these Terms and Conditions

Submit

# EXHIBIT
# 7



FedEx Express
Customer Support Trace
3875 Airways Boulevard
Module H, 4th Floor
Memphis, TN 38116

U.S. Mail: PO Box 727
Memphis, TN 38194-4643

Telephone: 901-369-3600

December 28,2007

Dear Customer:

The following is the proof of delivery you requested with the tracking number **861892506020**.

---

**Delivery Information:**

---

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivery date: | Jun 29, 2007 09:15 |
| Signed for by: | 9999999999999 | | |
| Service type: | Priority Overnight | | |

NO SIGNATURE IS AVAILABLE
FedEx Express Proof of delivery details appear below, however no signature is currently available for this FedEx Express shipment.  Availability of signature images may take up to 5 days after delivery date.

---

**Shipping Information:**

---

| | | | |
|---|---|---|---|
| Tracking number: | 861892506020 | Ship date: | Jun 28, 2007 |

**Recipient:**
MC LEAN, VA US

**Shipper:**
WASHINGTON, DC US

Thank you for choosing FedEx Express.

FedEx Worldwide Customer Service
1.800.GoFedEx 1.800.463.3339

Track Shipments/FedEx Kinko's Orders
## Detailed Results

Quick Help

| | | | |
|---|---|---|---|
| **Tracking number** | 861892506020 | **Destination** | MC LEAN, VA |
| **Signed for by** | 9999999999999 | **Service type** | Priority Overnight |
| **Ship date** | Jun 28, 2007 | | |
| **Delivery date** | Jun 29, 2007 9:15 AM | | |
| **Status** | Delivered | | |
| **Signature image available** | No | | |

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| **Jun 29, 2007** | 9:15 AM | **Delivered** | MC LEAN, VA | Package delivered to recipient address - release authorized |

| Signature proof | Track more shipments/orders |
|---|---|

E-mail your detailed tracking results (optional)

Enter your name and e-mail address, submit up to three e-mail addresses, add your message (optional), and click **Submit**. If you include a message, you must enter your name and e-mail address in the fields provided.

**Add personal message:**

**Your Name:**

**Your E-mail Address:**

**To E-mail Address(es):**

Not available for non-English characters

By selecting this check box and the Submit button, I agree to these Terms and Conditions

Submit

# EXHIBIT
# 8



**Service Info**

# Tracking

**Ship Now**          **Open a FedEx Account**                              **Get Rates**

Want an update on the status of your shipment? You can get tracking information in several ways, including via FedEx InSight® at fedex.com, which monitors your shipments 24 hours a day.

**FedEx InSight**

FedEx InSight is an online tracking assistant working behind the scenes to automatically monitor your shipments, even when you're off the computer. So each time you do sign in, you get an updated look at the status of your deliveries — express and ground, inbound, outbound and third-party.

**Track at fedex.com by Tracking Number or Door Tag Number**

Select the Track tab and enter up to 30 tracking or Door Tag numbers at a time for updates on the status of your shipments.

**Track at fedex.com by Reference Number**

Go to Alternate Reference Tracking then enter the reference number you provided at the time of shipment.

**Track by Phone**

Away from your computer? Call 1.800.GoFedEx (1.800.463.3339) and press 2 to track the status of your shipment (1.800.247.4747 for international shipments).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JULIA GRIFFITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No. 07-1745 (JDB) |
| | ) |
| CHRISTOPHER COX, Chairman, | ) |
| U.S. Securities and Exchange Commission, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**<u>ORDER</u>**

UPON CONSIDERATION of Defendant's motion to dismiss and/or for summary judgment, and for good cause shown, it is hereby:

ORDERED that Defendant's motion is GRANTED, and it is further

ORDERED that the Complaint in this action is hereby dismissed with prejudice.

_____                        _____
Date                                                             JOHN D. BATES
                                                                       United States District Judge

Copies to Counsel of Record Via ECF